# GOLDBERG *v.* UNITED STATES

No. 74–6293.  Argued January 14, 1976—Decided March 30, 1976

Brennan, J., delivered the opinion of the Court, in which Stewart, White, Marshall, Blackmun, Rehnquist, and Stevens, JJ., joined. Stevens, J., filed a concurring opinion, in which Stewart, J., joined, *post*, p. 112. Powell, J., filed an opinion concurring in the judgment, in which Burger, C. J., joined, *post*, p. 116.

*Donald C. Smaltz,* by appointment of the Court, 423 U. S. 817, argued the cause and filed briefs for petitioner.

*Paul L. Friedman* argued the cause for the United States. With him on the brief were *Solicitor General*

*Bork, Assistant Attorney General Thornburgh, Deputy Solicitor General Frey, Sidney M. Glazer,* and *Marshall Tamor Golding.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case presents important questions of construction and administration of the Jencks Act, 18 U. S. C. § 3500.[1]

---

*\*Frank Matthew Mangan* filed a brief for the California Attorneys for Criminal Justice et al. as *amici curiae* urging reversal.

[1] The statute provides in full:

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial

That statute provides that in a federal criminal prosecution, after a witness called by the United States has testified on direct examination, the court, on motion of the defendant, shall order the United States to produce any "statement," as defined in the Act, in the possession of the United States that relates to the subject matter as to which the witness has testified. The definition of "statement" in § 3500 (e) pertinent to this case is: "(1) a written statement made by said witness and signed or otherwise adopted or approved by him."

At petitioner's trial in the District Court for the District of Arizona on charges of mail fraud in violation of 18 U. S. C. § 1341, the trial judge sustained the Government's contention that certain writings of Government lawyers of conversations with the Government's key wit-

---

judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

"(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

ness were "the work product of counsel," although the judge had not examined the writings. The Court of Appeals for the Ninth Circuit affirmed but on a different ground. In an unpublished memorandum opinion the Court of Appeals stated: "Apart from the question whether such notes were exempt from the Jencks Act . . . as 'work product,' they were not statements of the [witness] within the meaning of § 3500 (e)." [2] We granted certiorari limited to the Jencks Act question, 422 U. S. 1006.[3]

We hold that a writing prepared by a Government lawyer relating to the subject matter of the testimony of a Government witness that has been "signed or otherwise adopted or approved" by the Government witness is producible under the Jencks Act, and is not rendered nonproducible because a Government lawyer interviews the witness and writes the "statement." We hold further that in the circumstances of this case the Court of Appeals erred in determining in the first instance that the writings in question were not "statements." We therefore vacate the judgment of the Court of Appeals and re-

---

[2] In the Court of Appeals' opinion the bracketed word is "defendant" rather than "witness," but this error was apparently inadvertent.

[3] The Court granted the petition "limited to Question 8 presented by the petition," 422 U. S. 1006, which reads as follows:

"Whether 18 U. S. C. § 3500, the Jencks Act, contains an 'attorney's work product exception'; and whether a Government attorney's notes of conversations with the key Government witness, to whom the prosecutors read back their notes from time to time where the witness corrected same, which notes were prepared 'only after lengthy conversations had occurred and a mutual understanding of the factual situation' had been reached, if not compellable under the Jencks Act, are compellable under the doctrine of *Brady vs. Maryland*, [373 U. S. 83 (1963)]."

In light of our result, we need not address the *Brady* claim. See n. 15, *infra*.

mand the case to the District Court for further proceedings consistent with this opinion, following the procedure in *Campbell* v. *United States,* 365 U. S. 85 (1961) (*Campbell I*).

## I

Petitioner, with Edwin S. Newman and three other co-defendants, was charged in a multiple-count indictment with using the mails to defraud by means of a fraudulent scheme, which may be briefly summarized. The Financial Security Life Insurance Co., of which petitioner was president, issued single-premium annuities to various individuals; the policies purported to be fully prepaid and were used as collateral for loans. Promissory notes were accepted in lieu of the premiums, and interest on the notes was the only money paid to the company. Further, the policies were misrepresented as being free of liens or encumbrances. In fact, the policies were valueless. Petitioner concealed these facts from lenders who accepted the policies as collateral; indeed, the company refused payment of the proceeds of the policies to the lenders upon the ground of nonpayment of premiums. The three codefendants were charged with using the annuities as collateral to obtain loans. Petitioner used these "sales" of annuities to inflate the assets of the company on paper, intending eventually to sell the company.

Of the five defendants, only petitioner and Newman worked for the company. Newman agreed to plead guilty to a single count of the indictment and to testify as a Government witness. Thereupon his case was severed prior to petitioner's trial.[4] He was the key prosecution witness, revealing in great detail the operation of the fraudulent scheme and the transactions al-

---

[4] The other three codefendants entered guilty pleas.

leged in the indictment. Newman signed all of the cor-
respondence with lenders, but testified that at all times
he acted pursuant to instructions from petitioner. The
Government's case against petitioner consisted primarily
of Newman's testimony.

Prior to the trial, which covered seven weeks starting
May 22, 1973, the Government delivered to petitioner
a copy of Newman's testimony before the grand jury, a
memorandum of an interview with Newman conducted by
a postal inspector over three years earlier, and a reporter's
transcript of an interview with Newman conducted by
two Government lawyers on May 11, 1973. The May 11
transcript indicated that the lawyers intended to con-
duct further interviews with Newman concerning other
transactions. At the trial, on cross-examination on
June 27, Newman disclosed that he had met with the
lawyers on May 13, June 9 and 10, and part of each day
from June 16 through June 27. Unlike the May 11
meeting, no reporter was present. Newman's forthcom-
ing trial testimony was the subject of the discussion, but
the notes of the interview were handwritten by the
lawyers. Significantly, however, Newman testified, speak-
ing of the May 13 interview:

> "Q. And as they took notes, did they sometimes
> question you about what you had just said to make
> sure that they got it down correctly?
> "A. They may have. I don't really remember that
> that was part of the pattern."

And again, speaking of the June 9 and June 10 inter-
views, Newman testified:

> "Q. As you were explaining—or discussing your
> testimony, did anyone take notes?
> "A. The two gentlemen took notes.
> "Q. Were they occasionally read back to you to

see whether or not they correctly understood what you were saying?

"A. Probably from time to time.

"Q. All right, sir. Did you either correct them or say, 'Yes, that's right,' or 'No, that's not right because it went this way, I believe,' words to that effect?

"A. Yes, that would happen."

Finally, he described this as the pattern followed at all remaining meetings with the lawyers.

At this point petitioner moved, pursuant to § 3500 (b), for an order directing the United States to deliver the notes to the defense. The trial judge, without waiting to hear from the Government, denied the motion on the ground that the material was "attorney's work product." Petitioner renewed the motion the following day, coupling the motion with a request that the Government be ordered to deliver the material for *in camera* inspection by the court. The motions were denied, but with leave to submit a memorandum in support of the motions. Petitioner's memorandum argued against the existence of a "work product" exception and renewed the request for an order directing delivery of the material for *in camera* inspection. Thereafter, the Government orally argued that the material in question was not producible as "the work product of counsel," and the judge again denied petitioner's motions. On appeal, the material, which totaled 237 pages and was not part of the District Court record, was lodged with the Court of Appeals.

## II

We see nothing in the Jencks Act or its legislative history that excepts from production otherwise producible statements on the ground that they constitute "work

product" of Government lawyers. It is not clear from its brief that the Government argues to the contrary;[5] rather, the Government's principal contention seems to be that in any event the principles underlying the "work product" doctrine suggest a narrow construction of "statement" as not to include a lawyer's "work product" even though it fits the statutory definition of a producible statement. We reject the argument, since the plain language of the statute, fully buttressed by legislative history, allows no room for the tendered exception.

The Government maintains that the Act can be read to include only statements given to a Government investigative or law enforcement agent during an investigation, and not those given to a Government trial attorney in preparation for trial. This contention rests in part on the original language of § 3500 (a), which postponed discovery, until after a witness' direct examination, of statements of the witness made "to an agent of the Government."[6] But nothing in the Act even remotely sug-

---

[5] "We believe that there is no broad attorney's work-product exception to the Jencks Act that shelters statements relating to the subject matter of the testimony of a witness merely because the statements were obtained by a government attorney rather than a government investigator. For if what is involved is truly the statement of the *witness*—that is, a statement written and signed or otherwise formally adopted or approved by him or a substantially verbatim recording of an oral statement—by definition it does not contain the mental impressions, trial strategy or personal beliefs of an attorney. Such material thus implicates only tangentially, if at all, the policies underpinning the work product doctrine." Brief for United States 27–28. But an inconsistent position is suggested, *id.*, at 19–20, 49–53, and n. 32.

[6] The phrase "to an agent of the Government" was deleted from § 3500 (a) in 1970 when the Act was amended to add grand jury statements to the statutory definition of "statement." Pub. L. 91–452, § 102, 84 Stat. 926. Petitioner recognizes that the deletion was not intended otherwise to expand the disclosure requirements of the Act.

gests that "an agent of the Government" excludes Government lawyers.[7] In any event, § 3500 (b) requires production of "any statement (as hereinafter defined) of the witness in the possession of the United States" without any limitation to statements made "to an agent of the Government." Section 3500 (e)(1) defines a producible statement as one "made by said witness and signed or otherwise adopted or approved by him" with no limitation that it be a statement made "to an agent of the Government."

The Government also suggests that Congress enacted the Jencks Act to limit the scope of this Court's decision

---

[7] The Government cites a statement by Senator Javits that "this bill is intended to relate only to statements or reports of government agents, and we understand those to mean enforcement officials," 103 Cong. Rec. 15927 (1957), and argues that "[i]n common parlance a government trial attorney is not considered an 'enforcement official.'" No justification is advanced, and we can think of none, for excluding some Department of Justice employees, but not others, from the category of enforcement officials. In any event the Javits statement is a weak reed upon which to rest the argument. Senator Javits' statement had nothing whatever to do with the kind of official to whom a witness' statement is given; he was responding to an inquiry as to the officials who must respond to an order to deliver materials:

"MR. WATKINS. Suppose the information is in the files of the United States marshal for the district.

"MR. JAVITS. The normal discovery rules would apply, because this bill is intended to relate only to statements or reports of Government agents, and we understand those to mean enforcement officials." *Ibid.*

And that his use of the description "enforcement officials" was not meant as a limitation is crystal clear in his final response to the inquiry:

"MR. JAVITS. I am willing to say this to the Senator: I would be glad, for myself, to apply the provisions of this bill to all officials of the Federal Government. If the words do go that far, it is perfectly all right with me, and I know exactly what I am voting for. I think they do." *Ibid.*

in *Jencks* v. *United States,* 353 U. S. 657 (1957), and since *Jencks* involved statements to an investigative agency—the Federal Bureau of Investigation—Congress intended to require production only of statements of witnesses made to investigative agencies, not those given to prosecutors in preparation for trial.

That the Act was not intended to limit the *Jencks* decision is apparent from its legislative history. Rather than limiting, the Act "reaffirms [*Jencks*] in its holding that a defendant on trial in a criminal prosecution is entitled to relevant and competent reports and statements in possession of the Government touching the events and activities as to which a Government witness has testified at the trial." S. Rep. No. 981, 85th Cong., 1st Sess., 3 (1957). See H. R. Rep. No. 700, 85th Cong., 1st Sess., 4 (1957); *Campbell I,* 365 U. S., at 92. Moreover, Congress was concerned, not with the *Jencks* decision itself, but with "misinterpretations and misunderstandings" in application of *Jencks* in district courts and courts of appeals. S. Rep. No. 981, *supra,* at 3–5, 7–12; H. R. Rep. No. 700, *supra,* at 2–3, 6. The concern was that misapplication of *Jencks* would permit defendants "to rove at will through Government files." S. Rep. No. 569, 85th Cong., 1st Sess., 3 (1957). See *Palermo* v. *United States,* 360 U. S. 343, 350 (1959). The House committee expressed its goal as that of preventing defendants from "rummag[ing] through confidential information containing matters of public interest, safety, welfare, and national security." H. R. Rep. No. 700, *supra,* at 4.[8]

---

[8] The Government's assertion that Congress was concerned that "a government trial lawyer's notes made in preparation for trial not be routinely disclosed to the defense" is totally without support in the legislative history and the Government cites none. On the contrary, the Government expressed its agreement with the disclosure of materials within the definition of § 3500 (e), without suggesting that a Government lawyer's notes are protected. See H. R. Rep. No.

The objective of preventing "rummaging" plainly adds no support to the argument that Congress meant that distinctions should be made based upon the occupation of the Government official to whom the witness gave the statement.[9]

The Government urges as a "primary reason" for adopting its construction that it is unfair to allow defense counsel to impeach a witness by using a statement that "could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Palermo* v. *United States, supra*, at 350. The short answer to that argument is that writings must be produced only to the extent they are "statements" as defined; further, § 3500 (c) expressly provides a procedure for excising any matter not relevant to the witness' direct testimony.

For the same reasons, we see no merit in the Government's argument that, without an exception, disclosure of statements taken by Government lawyers may undermine the policies that gave rise to the work-product doctrine. See *United States* v. *Nobles,* 422 U. S. 225, 236–239

---

700, 85th Cong., 1st Sess., 7–12 (1957) (statement of Attorney General Brownell).

[9] It is also urged that notes of an attorney of an interview will differ from those taken by investigative agents. The trial attorney, it is argued, is more likely to record mental impressions and trial strategy and take notes only for the purpose of personal recollection, a "highly individualistic matter." The investigative agent, on the other hand, has assertedly greater concern with recording a witness' statement completely, because he is gathering facts, "raw data," to be used by others. Those arguments may be relevant to the determination whether given materials constitute a "statement," but the distinction in this respect cannot, in the face of the Act's broad and inclusive definition of "statement," make the obligation to produce turn on the title of the official who takes the statement. In addition, the distinction would be recognized in proper administration of the Act. See *infra,* at 106.

(1975); *Hickman* v. *Taylor*, 329 U. S. 495 (1947). Proper application of the Act will not compel disclosure of a Government lawyer's recordation of mental impressions, personal beliefs, trial strategy, legal conclusions, or anything else that "could not fairly be said to be the witness' own" statement. "If a government attorney has recorded only his own thoughts in his interview notes, the notes would seem both to come within the work product immunity and to fall without the statutory definition of a 'statement.' " *Saunders* v. *United States,* 114 U. S. App. D. C. 345, 349, 316 F. 2d 346, 350 (1963) (Reed, J.).[10] Furthermore, if a witness has for some reason "adopted or approved" a writing containing trial strategy or similar matter, such matter would be excised under § 3500 (c) as not relating to the subject matter of the witness' testimony or direct examination. Thus, the primary policy underlying the work-product doctrine—*i. e.,* protection of the privacy of an attorney's mental processes, *United States* v. *Nobles, supra,* at 238—is adequately safeguarded by the Jencks Act itself.

The Government contends that production of statements written by Government lawyers "forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witness' remarks." *Hickman* v. *Taylor, supra,* at 513. Although the risk of such testimony supported approbation of the work-product doctrine in *Hickman,* the nature of the disclosure provided by the Jencks Act differs significantly. In *Hickman* the Court concluded that there was no showing of necessity strong enough to justify the requested disclosure: there was a danger of inaccuracy and untrustworthiness, there

---

[10] For the same reason, we are not persuaded that acceptance of a definition of "statement" that includes prosecutors' notes "might reveal the inner workings of the investigative process and thereby injure the national interest." *Palermo* v. *United States,* 360 U. S. 343, 350 (1959).

was "[n]o legitimate purpose," and use of the attorney's words for impeachment would have made the attorney a witness rather than an officer of the court. 329 U. S., at 512–513. First, although there is some risk that a witness' words will be distorted in notes taken by a Government lawyer, see *Palermo* v. *United States,* 360 U. S., at 352, there is no such danger where a witness has adopted or approved the lawyer's notes. Second, there is a clearly legitimate—and congressionally recognized—purpose for disclosure under the Jencks Act. The Act requires disclosure of all statements for use in impeaching witnesses and "is thus designed to further the fair and just administration of criminal justice." *Campbell I,* 365 U. S., at 92. Third, the lawyer is not called upon to be a witness, since statements are produced only where they can "fairly be said to be the witness' own." Finally, we cannot accept the Government's claims that defense counsel will have a right to call Government lawyers as witnesses to "authenticate" their notes,[11] nor do we find realistic the Government's fear that a lawyer will "feel impelled" to take the stand.[12]

---

[11] There is no reason to require or permit such authentication where the district court has already determined that a writing has been adopted or approved by a Government witness.

[12] The Government suggests that there may be a need for testimony to explain the meaning of a lawyer's notes. But any explanation by the lawyer would be meaningless if the notes as written have been adopted or approved by the witness. Further, the Government asserts that a lawyer may want to testify to contradict his witness. Such a desire, we are told, is created where a witness repudiates some part of the notes that is inconsistent with the witness' trial testimony. Once the court has found that the witness adopted or approved the lawyer's writings, further testimony—either by the lawyer or the witness—as to whether the statement was made is repetitive and could be excluded by the court in its discretion. Fed. Rule Evid. 403. In addition, if the witness claims that he was being truthful in the statement and not at trial, or vice

We therefore conclude that the District Court erred in holding that the work-product doctrine bars production of writings otherwise producible under the Jencks Act.[13]

### III

The Court of Appeals erred in undertaking to make the initial determination whether the materials constituted producible "statements." If that function may ever be properly undertaken by a court of appeals, the Court of Appeals should not have attempted to make the determination in this case. *Campbell* v. *United States,* 373 U. S. 487, 493 (1963) (*Campbell II*).

We have recognized that a Government objection to production may require that the trial court inspect documents or hold a hearing to gather extrinsic evidence bearing on the extent to which the documents are statements producible under § 3500.[14] *Campbell I, supra,* at

---

versa, or simply admits the inconsistency, we see no compelling motivation for testimony by the Government lawyer who wrote the statement; the statement used to impeach the witness is not the lawyer's, but the witness'.

The Government also urges that the risk of forcing lawyers to testify would be eliminated by construing the Act to require written adoption or approval "comparable to a signature." We see no realistic risk for the reasons stated above. Furthermore, we have not discovered any meaningful legislative history to support such a reading.

[13] The Courts of Appeals that have considered the applicability of the "work product" doctrine to the Jencks Act have uniformly reached the same conclusion. *Saunders* v. *United States,* 114 U. S. App. D. C. 345, 349, 316 F. 2d 346, 350 (1963) (Reed, J.); *United States* v. *Aviles,* 315 F. 2d 186, 191 (CA2 1963); *United States* v. *Hilbrich,* 341 F. 2d 555, 557 (CA7), cert. denied, 381 U. S. 941 (1965); *United States* v. *Smaldone,* 484 F. 2d 311, 317 (CA10 1973), cert. denied, 415 U. S. 915 (1974).

[14] Some courts have suggested that the trial court has an "affirmative duty" to secure the necessary evidence. *E. g., Saunders* v. *United States, supra,* at 348, 316 F. 2d, at 349; *United States* v. *Chitwood,*

92–93; *Palermo* v. *United States, supra,* at 354–355; cf. *Campbell II, supra,* at 493. In *Campbell I* the Court unanimously concluded that the trial judge was obliged to conduct some inquiry into the circumstances of the witness' interview there in question. 365 U. S., at 95; *id.,* at 107–108 (Frankfurter, J., dissenting in part and concurring in result in part). The circumstances of this case compel the same conclusion. Newman's testimony raised a sufficient question under the Act to require the trial judge to conduct such an inquiry, and since we hold that the trial judge erred in exempting the material from production as attorneys' "work product," a remand for such an inquiry by the District Court is required to determine whether petitioner's motion should have been granted.[15]

The necessity for a hearing in the District Court is highlighted by developments since our grant of the petition for certiorari. The Solicitor General has discovered that 40 of the 237 pages of material are not notes of Government lawyers but handwritten statements of Newman himself.[16] Petitioner contends that the failure of the Government to turn over those 40 pages constitutes error requiring reversal of his conviction without more.[17]

---

457 F. 2d 676, 678 (CA6 1972); *United States* v. *Keig,* 320 F. 2d 634, 637 (CA7 1963); *Ogden* v. *United States,* 303 F. 2d 724, 734 (CA9 1962).

[15] Pending the result of the proceedings on remand, we decline to examine the 237 pages of material. That is initially a task for the District Judge. For that reason any disposition of the *Brady* issue raised by petitioner, see n. 3, *supra,* must be deferred pending the District Court's inquiry on remand.

[16] After this discovery the Solicitor General delivered all 237 pages of material to petitioner's counsel. On oral argument he advised the Court that this disclosure was not intended as a concession that the material was producible under the Jencks Act.

[17] The Government argues that the issues pertaining to the notes written by Newman are beyond the scope of our grant of certiorari,

The Government, although conceding that these 40 pages contain "statements," argues that they nevertheless were not producible. The Government contends that Newman wrote the 40 pages after completing his direct testimony in order to aid the prosecution's cross-examination of a defense witness, and thus are not producible because not in existence at the time of petitioner's motion to produce,[18] but the Government admits that these assertions are not based on facts in the record. Any inquiry regarding them is not for this Court but for the District Court on remand. The same is true of the claim that in any event the contents of the 40 pages deal largely, if not entirely, with matter other than Newman's direct testimony.

As to the remainder of the 237 pages, there are other issues to be resolved on remand. For example, it will be necessary to determine whether the prosecutors' notes were actually read back to Newman and whether he adopted or approved them.[19] In addition, the court may

---

which was limited to the question whether there is an attorney's work-product exception to the Jencks Act. See n. 3, *supra*. But petitioner was not aware at the time of filing his petition for review that 40 pages of the notes were written by Newman, and the petition obviously was intended to cover the full 237 pages of papers. In that circumstance we shall treat the questions raised by the Newman notes as subsumed in the question presented.

[18] Another matter for the District Court is the parties' dispute whether there was a proper Jencks request when Newman testified on rebuttal.

[19] Every witness interview will, of course, involve conversation between the lawyer and the witness, and the lawyer will necessarily inquire of the witness to be certain that he has correctly understood what the witness has said. Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500 (e) (1), which is satisfied only when the witness has "signed or otherwise adopted or approved" what the lawyer has written. This requirement clearly is not met

have to consider whether the notes were in existence at the time of petitioner's motion.[20]

We of course intimate no view whether production of any of the 237 pages of material was required in this case. That determination is to be made by the District Court. We therefore conclude that the proper disposition of this case is that of *Campbell I, supra,* at 98–99. Petitioner is entitled to a redetermination of his motion for the production of the 237 pages of material. But we do not think that this Court should vacate his conviction and order a new trial, since petitioner's rights can be fully protected by a remand to the trial court with direction to hold an inquiry consistent with this opinion. The District Court will supplement the record with findings and enter a new final judgment of conviction if the court concludes after the inquiry to reaffirm its denial of petitioner's motion. This procedure will preserve petitioner's opportunity to seek further appellate review on the augmented record. On the other hand, if the court concludes that the Government should have been required to deliver the material, or part of it, to petitioner, and that the error was not harmless,[21] the District Court will

when the lawyer does not read back, or the witness does not read, what the lawyer has written.

[20] See n. 18, *supra.* By noting some of the issues that must be dealt with on remand—we hope we have set forth the most significant—we do not intend to limit the remand proceeding. It may be that further issues, heretofore overlooked or raised by evidence adduced in the remand proceeding, will also be presented for consideration.

[21] Since courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial, *Clancy* v. *United States,* 365 U. S. 312, 316 (1961), the harmless-error doctrine must be strictly applied in Jencks Act cases. *Campbell* v. *United States,* 373 U. S. 487, 497 n. 14 (1963) *(Campbell II)*; *Rosenberg* v. *United States,* 360 U. S. 367, 371 (1959); *id.,* at 376 (BRENNAN, J., dissenting). See *Kotteakos* v. *United States,* 328 U. S. 750, 765 (1946); *Gordon* v. *United States,* 344 U. S. 414, 422–423 (1953).

vacate the judgment of conviction and accord petitioner a new trial.

The judgment of the Court of Appeals is therefore vacated, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEW-ART joins, concurring.

The statutory definition of the term "statement" was intended by Congress to describe material that could be fairly used to impeach the testimony of a witness. A major purpose of the statute was to exclude from that definition various kinds of material which lower federal courts had been requiring the Government to produce because they had misinterpreted the narrow holding of the *Jencks* case itself.[1] That case, like the statute, applies only to material that may be used legitimately for impeachment.

The statutory definition is in two parts, encompassing originals of statements made by the witness (18 U. S. C. § 3500 (e)(1)) and verbatim or substantially verbatim copies (§ 3500 (e)(2)). Whether a particular writing is an original or a copy, it is not a statutory "statement" unless it reflects the witness' own words fully and without distortion.[2] If it is truly an impeaching statement,

---

[1] See H. R. Rep. No. 700, 85th Cong., 1st Sess., 2–3 (1957); *Palermo* v. *United States,* 360 U. S. 343, 345–346, and n. 3.

[2] Congress was specifically concerned about the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral interview. We emphasized this concern in a discussion of the legislative history of § 3500 (e)(2) which is unquestionably relevant to the issue before us even though we are directly concerned with § 3500 (e)(1):

"It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should

it is in a form which either party could use to prevent the witness from testifying to facts inconsistent with those stated to the interviewer.[3]

Frequently such statements are in the form of narratives or summaries actually drafted by the interviewer

---

be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' and 'continuous, narrative statements made by the witness recorded verbatim, or nearly so . . . ,' see Appendix B, *post,* p. 358, that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions." *Palermo* v. *United States, supra,* at 352–353.

[3] Although typically at trial it is defense counsel who tries to impeach a Government witness, it is important to remember that there are many situations in which the prosecution may also have the right to confront a recalcitrant, forgetful, or perjurious witness with a prior statement in order to induce him to tell the whole truth and nothing but the truth. In deciding whether a writing is a Jencks Act statement, it is therefore important for the district court to keep in mind the reason for its production.

"It has always been, and will remain, the practice of the FBI and every other Federal law enforcement agency to take written statements of important witnesses. This is vital not only to insure the accuracy of the statement at the time it is made but to tie the witness down so that he will stand by the statement which he has read and signed." H. R. Rep. No. 700, *supra,* at 6.

and signed or otherwise unequivocally adopted or approved by the prospective witness. In such instances the document is equally a statement whether the interview was conducted by a layman or a lawyer. The question is simply whether the approval by the witness is sufficiently unambiguous to make it fair for either party at a subsequent trial to use that statement to refresh his recollection or to impeach his testimony.[4]

The writings which are made by a lawyer when he is outlining his examination of a witness are of a much different character and are intended to serve a different purpose. They may include his own impressions of the case, his proposed line of questioning, comments on his trial strategy, references to questions of admissibility, legal theory, and a host of other matters. Such comments in the prosecutor's notes may relate to the subject matter of the witness' testimony, and the witness may express approval of what the prosecutor has said about such matters. Nevertheless, it is perfectly clear that such comments by the prosecutor are not "statement[s] made by [the] witness" within the meaning of § 3500 (e)(1). In short, more than relevance to the testimony and approval by the witness is necessary to make a writing a Jencks Act statement. It must first of all be the kind of factual narrative by the witness that is usable for impeachment.

If one of the prosecutor's notes is that kind of factual comment, it is still not a statutory statement unless that specific note has been adopted or approved by the witness. For if a witness could testify, without fear of

---

[4] A summary of an interview with a witness becomes that witness' own words only when adopted as such by the witness. Thus after a witness has authenticated or verified a summary it is unnecessary to determine whether it is "substantially verbatim" because by the terms of 18 U. S. C. § 3500 (e)(1) it has become the witness' own words.

contradiction, that the words used by the prosecutor were not his own, the document would not impeach his testimony and could not properly be offered for that purpose. General testimony that some of the notes taken by the prosecutor during a lengthy interrogation were read back to the witness, and that the witness sometimes assented to the prosecutor's version of what he said, would not justify a finding of approval of any particular note. Fairness to the witness demands a much stricter test of approval before he may be confronted with assertedly prior inconsistent statements.

Whether this requirement can be satisfied without the testimony of the prosecutor is a question that is not ripe for decision.[5] The possibility of the need for such testimony is a matter which the trial court may appropriately consider in determining whether any specific note is producible. For nothing in the legislative history of the Act suggests that Congress intended to authorize cross-examination of the prosecutor by defense counsel. In order to avoid the risk of unseemly testimony by trial counsel and, more importantly, in order to avoid unfairness to the witness, any determination that a portion of the prosecutor's notes is producible must be supported

---

[5] The problem is apt to arise when a witness has approved some but not all of what the prosecutor has said; for then it is necessary to ascertain *which* notes have been specifically approved. Normally that question would have to be answered on the basis of colloquy or testimony outside the presence of the jury. In such a hearing the notes could not be read to the witness without impairing their usefulness as impeaching evidence, see *Campbell* v. *United States*, 365 U. S. 85, 97; accordingly, there is a real danger that the lawyer's testimony may be needed if the issue is in dispute. Moreover, a finding of approval by the judge in a proceeding outside the presence of the jury would not foreclose a denial of such approval by the witness when he is on the stand. In that event, only the prosecutor's testimony or stipulation could qualify the document for use as impeaching evidence.

by a finding of unambiguous and specific approval by the witness.[6]

Since I do not understand these additional comments to be inconsistent with anything in the Court's opinion, I join that opinion.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring in the judgment.

Petitioner, Philip Goldberg, moved that the prosecutors' notes prepared during the extensive interviews with the witness Newman be produced pursuant to the Jencks Act (Act), 18 U. S. C. § 3500. The Court remands this case with directions that the trial court determine whether the prosecutors' notes were "statements" within the meaning of the Act. This disposition is stated in the following language:

> "Newman's testimony raised a sufficient question under the Act to *require* the trial judge to conduct such an inquiry, and since we hold that the trial judge erred in exempting the material from production as attorneys' 'work product,' a remand for such an inquiry by the District Court is required to determine whether petitioner's motion should have

---

[6] In *Palermo* we emphasized the need for fairness to the witness: "One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of *Jencks* would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness. Not only was it strongly feared that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process and thereby injure the national interest, but it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." 360 U. S., at 350.

been granted." *Ante,* at 109 (emphasis added; foot-note omitted).

I am in general accord with the Court's treatment of the "work product" question, but I do not agree that New-man's testimony *required* the trial judge to conduct an inquiry into producibility. Indeed, had the trial judge ruled that Newman's testimony was insufficient to justify further inquiry, rather than relying on the "work prod-uct" privilege, I would have affirmed the denial of Gold-berg's motion. I write separately because my disagree-ment with the Court on this central point raises impor-tant questions about the proper administration of the Act. Remand is appropriate for reasons other than those voiced by the majority, however, and I concur in the Court's judgment that the case should be remanded.

## I

Goldberg's motion rested solely on information elicited from Newman during cross-examination. The entire pertinent cross-examination is set out in the margin.[1]

---

[1] "Q. So you met with the Government representatives on May 12, is that right?

. . . . .

"A. Yes, I met with the Government on May 12th.
"Q. And did you discuss what your testimony would be here?
"A. Yes.
"Q. Who did you discuss it with?
"A. Mr. Lebowitz, Mr. Keilp.
"Q. And did they take notes or jot down anything at all of what you were saying?
"A. Yes.
"Q. There wasn't a reporter present?
"A. No.
"Q. And as they took notes, did they sometimes question you about what you had just said to make sure that they got it down correctly?

The opinion of the Court concludes that the interchange in this limited cross-examination "raised a sufficient question under the Act to require the trial judge to conduct"

---

"A. They may have. I don't really remember that that was part of the pattern.

.        .        .        .        .

"Q. Did you discuss your testimony [on June 9 and 10]?

"A. With Mr. Lebowitz and Mr. Keilp?

"Q. Yes.

"A. Yes.

"Q. Was a reporter there?

"A. No.

"Q. As you were explaining—or discussing your testimony, did anyone take notes?

"A. The two gentlemen took notes.

"Q. Were they occasionally read back to you to see whether or not they correctly understood what you were saying?

"A. Probably from time to time.

"Q. All right, sir. Did you either correct them or say, 'Yes, that's right,' or 'No, that's not right because it went this way, I believe,' words to that effect?

"A. Yes, that would happen.

.        .        .        .        .

"Q. Did you meet with them on the 11th [of June]? Mondays have not been a court day thus far.

"A. Yes, I did meet with them on the 11th.

"Q. Same procedure, you talked with them, they write down what you are saying?

"A. Yes.

.        .        .        .        .

"Q. BY MR. SMALTZ: When was the next time you came back to Phoenix?

"A. Saturday the 16th.

"Q. Did you meet with the Government representative?

"A. Yes.

"Q. Same procedure?

"A. Yes.

"Q. Same questions, answers, read-backs, notes, whole bit?

"A. Yes, sir.

an inquiry into whether the prosecutors' notes were producible under subsection (e)(1). At the same time, the Court purports to recognize that interview notes, whether prepared by a prosecutor or by some other interviewer, are not routinely producible.

> "Every witness interview will, of course, involve conversation between the lawyer and the witness, and the lawyer will necessarily inquire of the witness to be certain that he has correctly understood what the witness has said. Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500 (e)(1), which is satisfied only when the witness has 'signed or otherwise adopted or approved' what the lawyer has written. This requirement clearly is not met when the lawyer does not read back, or the witness does not read, what the lawyer has written." *Ante,* at 110–111, n. 19.

Compare *Campbell* v. *United States,* 365 U. S. 85 (1961) (*Campbell I*), and *Campbell* v. *United States,* 373 U. S. 487 (1963) (*Campbell II*), with *Palermo* v. *United States,* 360 U. S. 343 (1959). In my view, the fact that interview notes frequently will not be produc-

---

"Q. How long were you in conference with the Government representative on the 16th?

"A. Well, I have a recollection of arriving at the Federal Building a little after 1:00 o'clock. I think we met until 5 or 6.

"Q. How long on the 17th?

"A. From about 11 to 5 or so.

"Q. When was the next time that you met with Government representatives after the 17th?

"A. I have met with them during portions of each day since.

"Q. Did they go over your proposed testimony with you?

.      .      .      .      .

"A. Yes, they went over my testimony with me.

"MR. SMALTZ: Your honor, at this time, under 3500, I move for the—"

ible means that collateral proceedings into their producibility should not be required unless there is good reason to believe they may be "statements."[2]  In this light, it is evident that Newman's cursory and ambiguous testimony was wholly insufficient to require the judge to interrupt the trial and conduct a collateral inquiry, for it showed nothing more than "discussions of the general substance of what the witness [had] said."

The questions asked simply failed to focus on the critical inquiry: whether a "statement" of the witness, embodied in the prosecutors' notes, had been "adopted or approved."[3]  The conferences with Newman occurred from time to time over several weeks, with the prosecutors presumably taking notes at each conference.  Goldberg's counsel, however, did not even ask whether notes were taken at the June 17 conference or at subsequent ones.[4]  As to the June 11 meeting with Newman, counsel only asked whether notes had been taken.[5]  The ques-

---

[2] When the prosecutor is in possession of documents which he knows to be statutory "statements," he is required to produce them upon the defendant's motion without any showing on the part of the defendant.  This opinion is addressed only to the problem that arises when the producibility of documents is disputed and the defendant seeks to obtain a collateral inquiry into the issue.

[3] Neither the Court nor the parties have considered whether the notes fall within the subsection (e)(2) definition of "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously." 18 U. S. C. § 3500 (e)(2).  The questions asked of Newman were too unfocused to raise that possibility, just as they were insufficient to elicit the type of information justifying inquiry into producibility under subsection (e)(1).

[4] The only question about the June 17 session related to its length.  The only pertinent question about subsequent sessions was:
"Q. Did they go over your proposed testimony with you?"

[5] "Q. Same procedure, you talked with them, they write down what you are saying?"
Newman's testimony ultimately suggested that there was in fact no meeting on June 11.

tions about the May 12 session were whether notes had been taken and, in essence, whether "discussions of the general substance" of the notes had occurred.[6] The questions about the June 9 and 10 conferences and the June 16 session were more illuminating, but only slightly. Counsel did ask whether the notes had been read back "occasionally" for commentary by Newman, but he never asked whether Newman had adopted or approved any portion of the final version of the prosecutors' notes or whether the reading back of the notes had merely elicited further discussion because Newman disputed the prosecutors' understanding.[7] The problem created by such aimless and unilluminating questions was compounded by counsel's satisfaction with vague and ambiguous answers that hardly evidenced the criti-

---

[6] "Q. And did they take notes or jot down anything at all of what you were saying?

. . . . .

"Q. And as they took notes, did they sometimes question you about what you had just said to make sure that they got it down correctly?"
The latter question elicited an essentially negative response:
"A. They may have. I don't really remember that that was part of the pattern."
Newman subsequently indicated that he met with the prosecutors on May 13 rather than May 12.

[7] "Q. Were they occasionally read back to you to see whether or not they correctly understood what you were saying?
"A. Probably from time to time.
"Q. All right, sir. Did you either correct them or say, 'Yes, that's right,' or 'No, that's not right because it went this way, I believe,' words to that effect?
"A. Yes, that would happen.

. . . . .

"Q. Same procedure?
"A. Yes.
"Q. Same questions, answers, read-backs, notes, whole bit?
"A. Yes, sir."

cal statutory fact of specific adoption or approval of a statement as the witness' own.[8]

A showing as generalized as this should never be sufficient to require the trial judge to conduct collateral proceedings on the producibility of prosecutors' notes. If it is, collateral inquiry always will be required, for competent prosecutors rarely will go to trial without such "discussions of the general substance" with key witnesses and the related taking of notes to be used in the examination of such witnesses.[9] Certainly this would be the case with a witness of Newman's importance. The "needless trial of collateral and confusing issues" that the Court's approach encourages is not necessary for "assuring the utmost fairness to a criminal defendant" in the administration of the Jencks Act. *Palermo* v. *United States,* 360 U. S., at 355.

## II

In *Palermo* v. *United States, supra,* at 354, the Court recognized that the Act provides no procedure for resolving questions about whether a particular document is a "statement." Delineation of appropriate procedures therefore falls to the courts. To date, the cases of this Court's addressing procedures have been concerned with the nature of the collateral inquiry to be conducted by the trial judge when such inquiry is necessary. See,

---

[8] See, *e. g.,* n. 5, *supra.*

[9] Indeed, only the foolish or exceptionally talented counsel will depend solely on his memory when preparing for the examination of a key witness. But the fact that counsel usually will take notes does not mean that the notes often will be "statements." Counsel rarely take down verbatim what witnesses say in these preparatory conferences. Consequently, prosecutors' notes may be expected to meet the requirements of subsection (e)(2) very infrequently. Cf. n. 3, *supra.* The notes taken will vary from cryptic "memory jogs" to full summaries of the anticipated testimony.

*e. g., ibid.; Campbell I,* 365 U. S. 85 (1961).[10] But, as shown above, the nature of the collateral inquiry is not the initial question faced by the trial judge. He must first determine whether *any* collateral inquiry at all is necessary. My disagreement with the Court on the adequacy of Goldberg's foundational showing in this case suggests that more attention should be focused on this distinction.

The proper administration of the Act requires that the defendant meet an initial burden of showing that collateral inquiry is necessary to protect his rights under the Act. The placing of such a burden on the defendant is consistent with the basically adversary posture of the Act, which requires production of "statements" only upon the defendant's motion. See 18 U. S. C. § 3500 (b).[11] This requirement also is appropriate because the trial should not be interrupted for collateral proceedings absent a genuine need for them. Cf. *Palermo* v. *United States, supra,* at 355.[12]

---

[10] Neither *Palermo* nor *Campbell I* raised the question of what foundational showing a defendant must make to necessitate collateral proceedings. In both cases the disputed documents had been submitted for the trial judge's inspection. Attention in those cases therefore was focused on what the nature of collateral inquiry should be when such inquiry is appropriate.

[11] The adversary posture of the Act reflects "the directly opposed interests protected by the statute—the interest of the Government in safeguarding government papers from disclosure, and the interest of the accused in having the Government produce 'statements' which the statute requires to be produced." *Campbell I,* 365 U. S., at 95.

[12] An additional reason for putting such a burden on the moving defendant is that the Government's good faith in meeting its responsibilities under the Act should be presumed. Cf. *id.,* at 103–104 (Frankfurter, J., dissenting in part and concurring in result in part).

124

The burden on the moving defendant is not to prove the existence of a statutory "statement." The purpose of the collateral proceeding is to resolve that issue.[13] Rather, the burden is simply to establish by probative evidence—usually on cross-examination of the witness alleged to have given a statement—that there is reason to believe that a statutory "statement" may exist. Certainly more must be shown than a speculative possibility. If, as here, defendant's theory is that a prosecutor's notes meet the requirements of subsection (e)(1), questions must be asked the witness that focus on whether there was in fact an "adoption or approval" of a specific statement, rather than general concurrence in the correctness of the prosecutor's understanding of what the witness knows. Absent explicit answers to such questions that satisfy the defendant's burden, the trial judge should deny the motion for production without a collateral proceeding.

If a moving defendant meets the threshold burden of showing that a statutory "statement" may exist, the judge then must conduct a nonadversary inquiry suited to resolve the particular issue presented. *Campbell I, supra,* at 95–96; *Palermo* v. *United States, supra,* at 354–355. If the trial judge's inquiry is inadequate when inquiry is needed, it is appropriate for an appellate court to remand for further proceedings. In this case, however, the need for collateral proceedings was not

---

[13] The very nature of the question in a collateral inquiry into producibility under subsection (e)(1) re-emphasizes the need for the defendant to make a showing that such a proceeding is needed. A considerable amount of time could be consumed in determining the producibility of prosecutors' notes, for it is not unusual for a diligent prosecutor to spend more time mastering the details of a key witness' knowledge and anticipated testimony than is required in the courtroom presentation of such testimony.

shown, and if the trial judge had denied Goldberg's motion on this ground the affirmance of denial by the Court of Appeals would have been appropriate.

## III

In conducting collateral proceedings, when appropriate, the trial judge must be faithful to the substantive standards of producibility embodied in the Act. I agree with MR. JUSTICE STEVENS that when subsection (e)(1) is relied upon a prosecutor's notes are producible only upon a "finding of unambiguous and specific approval" of specific notes. *Ante,* at 116. In my view, such a finding depends upon the witness' having approved specific notes with the knowledge that he is formalizing a statement upon which he may be cross-examined. Nothing less is sufficiently "unambiguous" in this context. This requirement is implicit in the standards of producibility embodied in subsections (e)(1) and (e)(2). Moreover, the requirement is necessary to protect interests sought to be served by the Act.

In applying the Act to typical interview notes alleged to have been "adopted or approved" by a witness, we must remember that such notes do not fit within the core of the Act. Subsection (e)(1) includes *"written statement[s] made by* [the] witness and signed or otherwise adopted or approved by him." [14] Subsec-

---

[14] In *Campbell I, supra,* at 104–106, Mr. Justice Frankfurter, joined by three other Justices, expressed the view that nonverbatim interview notes were never producible under the Act because subsection (e)(1) was addressed only to documents written by the witness. This view was rejected by a majority of the Court, *id.,* at 93–94, and the majority position was reaffirmed in *Campbell II,* 373 U. S. 487 (1963). The *Campbell* majorities properly recognized that there is little difference between a formal statement drafted by the witness and one drafted by the interviewer for the witness' ap-

tion (e)(2), not relied upon in this case, requires a "substantially verbatim" reproduction of an "oral statement made by [the] witness and recorded contemporaneously." Typical interview notes are selective—even episodic—and therefore fall outside of subsection (e)(2). Even if "adopted or approved" by the witness, such notes were not written by the witness himself and therefore fall without the core of subsection (e)(1). Typical interview notes that allegedly have been "adopted or approved" thus lack important guarantees of dependability that Congress relied upon in the central concept of subsections (e)(1) and (e)(2).[15] These guarantees, it should be noted, arise partly from the sense that a witness normally would have of "going on the record"[16] when he makes a statement within the core of subsection (e)(1) or subsection (e)(2).[17] It is to supply a compa-

---

proval. But the rule in *Campbell I* and *II* cannot be administered without sensitivity to the vast difference between the witness' approving a formally drafted statement and his approving far less formal interview notes. See the text, *infra*, at 126–127.

[15] Statements within the core of subsection (e)(1) have the dual guarantees of the witness' writing and his ratifying. Interview notes brought within subsection (e)(1) solely by the witness' ratification lack the former safeguard.

[16] It should not be forgotten that the Act provides for disclosure only of statements made by a "witness called by the United States." 18 U. S. C. § 3500 (b). In the ordinary course the Government in taking "statements" of such witnesses will impress upon them the probable use of the statements. Congress recognized as much, noting that one reason the Government takes statements is to "tie the witness down so that he will stand by the statement." H. R. Rep. No. 700, 85th Cong., 1st Sess., 6 (1957). The Government also may be expected to make producible statements available to such witnesses as aids to memory. See *Rosenberg* v. *United States*, 360 U. S. 367, 370 (1959).

[17] A witness would have an especially strong sense of "going on the record" in the context of subsection (e)(3), which governs a "statement . . . made by [the] witness to a grand jury." 18 U. S. C.

rable guarantee of dependability that the witness should know he is adopting the interview notes as a formalized statement.[18]

This exacting standard is required by the Act's attempt to assure fairness to witnesses and the Government as well as to defendants. See *Palermo* v. *United States*, 360 U. S., at 350; *Campbell I*, 365 U. S., at 95. As every trial lawyer knows, the testimony given in court rarely conforms precisely to what the witness

---

§ 3500 (e) (3). Interestingly, Congress has required somewhat less in the way of recording safeguards under subsection (e) (3) than under subsections (e) (1) and (e) (2). See n. 18, *infra*. Presumably this is because procedural safeguards seem less necessary as the formality of the "statement" increases. This, of course, further supports the requirement elaborated in the text.

[18] The basic notion that the Act, at least at its core, contemplates a formalized statement finds additional support in subsection (e)'s definitional approach. In defining "statement" as used in subsections (b), (c), and (d), subsections (e) (1), (e) (2), and (e) (3) use the word "statement":

"(e) The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

"(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

When it chose this language, Congress was not unaware that to lawyers "statement" connotes a formalized recordation of views:

"It has always been, and will remain, the practice of the FBI and every other Federal law enforcement agency to take written statements of important witnesses. This is vital not only to insure the accuracy of the statement at the time it is made but to tie the witness down so that he will stand by the statement which he has read and signed." H. R. Rep. No. 700, *supra*, at 6.

has said prior to trial in interviews with counsel. This is true in part because lengthy exploratory interviews often are required to refresh the witness' memory sufficiently to allow him to reconstruct events that may have transpired long before.[19] Such interviews and the related note taking serve to distill the essence of what the witness knows and to identify the relevant. The Act was not designed to allow a witness to be impeached by every arguable variation between his trial testimony and notes written by the prosecutor and casually approved by the witness during this process. The witness may have expressed only general assent to the prosecutor's understanding without any consciousness that he had to be ready to stand by every word in or nuance conveyed by the prosecutor's notes. If notes are producible on a showing of less than knowing adoption as a formal statement, honest and reliable witnesses will be postured wrongly before the jury as having made inconsistent statements. This is unfair to the witness, and it unduly handicaps the Government's efforts to convict guilty defendants.[20]

---

[19] It also is true because in the absence of unique powers of recall no witness can repeat verbatim what he has said previously in long interviews. This is not to suggest that such deviations indicate that the basic substance of the witness' testimony changes. Precision as to some facts may be expected (e. g., whether the witness was present when the bank robbery occurred), but some variations are inevitable in one's memory—and the articulation thereof—with respect to details (e. g., the precise time sequence of collateral events, the exact words used by actors or other witnesses).

[20] Such a practice also would be unfair to the individual prosecutor. Without guidance as to what is producible he could never know which of his notes might be subject to court order, and he might well fail to take sufficient care in getting a witness' focused approval. Again, in the core area of subsection (e)(1) and in subsection (e)(2) the prosecutor is not faced with such uncertainty. He knows, for example, that if he elects to record or transcribe an

## IV

For the reasons expressed in Parts I and II, the trial judge was entitled to deny Goldberg's motion without conducting a collateral inquiry. But he did not deny the motion because of the insufficient foundational showing. Rather, he ruled that the "work product" privilege protected the prosecutors' notes. Goldberg's counsel may not have sought to supplement his foundational showing because he had been led reasonably to believe that he had carried the burden of showing the necessity of an inquiry, and that the judge's denial was based solely on a mistaken view as to the "work product" privilege.[21]  For this reason, I concur in the judgment to remand.

---

entire interview with a witness, the recording or transcription will be a subsection (e)(2) statement. Such predictability was one of the goals of the Act.

[21] On the day after the trial judge originally denied the motion for production, Goldberg renewed his motion for disclosure orally. The following colloquy transpired:

"THE COURT: . . . Did you find a case that says they are compellable?

"MR. SMALTZ: No, sir, but I didn't find one that says they are not. And the Jencks Act—

"THE COURT: Tell you what you do, Mr. Smaltz. We are going to go ahead with the jury trial this morning and we are going to be here at least, from what you have both told me, another ten days, and over the weekend you can prepare whatever kind of a memorandum you want to give me on Monday that the Government can respond to Monday afternoon, and I will take a look at it and let's go on with the jury trial this morning.

"MR. SMALTZ: Well, all right, but one other—Okay, I'm happy to do that, Your Honor, except would you, at least, consider ordering the Government to make available for your in camera inspection their notes?

"THE COURT: I will order the Government to get their notes together and have them available in case an order is made, and I will see your memorandum first.

"MR. SMALTZ: All right, sir, thank you. I am ready to go."