**UNITED STATES of America, Plaintiff,**

v.

**Eugene Andrew Anthony ALGIE, Melvin Bridewell, Richard Kent Skinner, and Ruby Humphrey, Defendants.**

Crim. No. 79–53.

United States District Court,
E. D. Kentucky,
Covington Division.

Oct. 1, 1980.

Addendum to Opinion Dec. 3, 1980.

Patrick H. Malloy, U. S. Atty., James E. Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff.

Louis DeFalaise, Covington, Ky., for Skinner.

Richard R. Slukich, Covington, Ky., for Algie.

Thomas C. Smith, Covington, Ky., for Humphrey.

R. Michael Murphy, Lexington, Ky., for Bridewell.

BERTELSMAN, District Judge.

## INTRODUCTION

The primary issue before the court in this matter is whether the court may invoke its inherent powers and the provisions of Rules 102 and 403 of the Federal Rules of Evidence in fulfilling its ethical obligation "to *insist* that court officials, litigants and their lawyers cooperate" with the court to achieve the goal of "prompt disposition of the court's business."[1]

---

1. Canon 3 of the Code of Judicial Conduct, as originally promulgated by the American Bar Association and subsequently adopted by the Judicial Conference of the United States, reads in material part as follows:

"CANON 3–A Judge Should Perform The Duties of His Office Impartially and Diligently."

"The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office pre-

This is an issue of first impression, the resolution of which is fraught with grave importance for the administration of justice in the Eastern District of Kentucky and in other courts, state and federal. For, as the findings of fact hereinafter set forth demonstrate, unless the court has the authority to employ such powers to compel cooperation by the United States Attorney in expediting the criminal docket, the court's business, civil and criminal, will not be promptly disposed of, or in large measure disposed of at all. The court may insist on expeditious disposition of the cases on its docket until it is breathless, but its insistence may be flaunted at the whim of that official.

Other issues here presented are (1) whether the provision of the Jencks Act that witnesses' statements must be produced by the United States only after the direct examination of the witness, as a statute relating to criminal procedure and evidence, may be interpreted in the light of the subsequently enacted Federal Rules of Evidence above mentioned, Rules 2 and 17.1 of the Federal Rules of Criminal Procedure and the ethical standards quoted; (2) whether the terms of the Jencks Act may be applied in a manner that in complex criminal cases, as a practical matter, deprives the defendants of due process of law and effective assistance of counsel; (3) whether the time limitations of the Jencks Act must yield when literal observance of them will deprive litigants in other cases of their constitutional rights; and (4) whether the United States Attorney has a legal or ethical obligation to respond to the court's insistence, pursuant to its ethical obliga-

tions, that certain practices be eliminated which, by reason of needless waste of time, are resulting in a denial of substantial justice to thousands of litigants with cases on the docket of this court.

These issues arise by reason of the United States Attorney's adamant refusal, after being not only requested but ordered by the court, to produce Jencks Act statements in this complex criminal case[2] on the evening prior to a witness' testimony in the instance of ordinary witnesses and five days prior to trial in the instance of government agents or police officers. The court made clear that it would hear the United States Attorney on any special circumstances why such production would be prejudicial to the United States, and that if he could represent to the court that there was any danger of witness intimidation or any similar consideration, the court would be prepared to make exceptions.

The United States Attorney stated in effect in open court that he would insist on adhering to literal compliance with the Jencks Act time frame in this and all other criminal cases, unless, in his uncontrolled discretion, he chose to respect the court's order. In substance, the United States Attorney stated his intention to maintain this position in all criminal cases present and future regardless of its effect on the criminal and civil dockets of the court, and on the rights of criminal defendants and other litigants.

Recognizing that the United States Attorney was acting in good faith, albeit in the opinion of the court in a spirit of mis-

scribed by law. In the performance of these duties, the following standards apply:

A. ADJUDICATIVE RESPONSIBILITIES.

"A judge should dispose promptly of the business of the court...

"Commentary: Prompt disposition of the court's business requires a judge to devote adequate time to his duties, to be punctual in attending court and expeditious in determining matters under submission, and *to insist that court officials, litigants and their lawyers cooperate with him to that end.*

"Former Canon 18, Continuances, provided: 'Delay in the administration of justice is a common cause of complaint; counsel are fre-

quently responsible for this delay. A judge, without being arbitrary or forcing cases unreasonably or unjustly to trial when unprepared, to the detriment of parties, *may well endeavor to hold counsel to a proper appreciation of their duties to the public interest, to their own clients, and to the adverse party and his counsel, so as to enforce due diligence in the dispatch of business before the court.'* " (Emphasis added).

2. This is a prosecution of an alleged interstate gambling conspiracy, which involves voluminous documentary evidence, which must be interpreted by government witnesses.

guided zeal, the court chose not to employ its contempt powers, but rather to impose the sanction, pursuant to F.R.Ev. 403, that no witness would be allowed to testify, unless the court's order had been obeyed with respect to that witness. The United States Attorney informed the court that he would not comply with the order and moved for a continuance so as to take an immediate appeal, pursuant to 18 U.S.C. § 3731.

Thus the important issues described in the introduction to this opinion come before the court, but they cannot be considered in a vacuum. Other findings of fact essential to the resolution of these issues follow:

## FINDINGS OF FACT [3]

1. The facts pertaining to the resolution of this motion pertain not so much to the individual case as to the emergency situation which exists with regard to the dockets in the Eastern District of Kentucky and the conduct of the United States Attorney in refusing to cooperate with the court in its attempt to meet the demands of that docket.

2. Shortly after the present writer was installed as United States District Judge for the Covington Division of this Court, he met privately with the United States Attorney and explained to him the view of the court that, although the criminal docket was statutorily entitled to priority, it was the court's responsibility to see that justice was done not only in criminal cases, but in all cases filed with the court.

3. The court pointed out to the United States Attorney that there was on the Covington docket a backlog of some 250 civil cases, and in the other divisions of the court a backlog of several thousand cases. The court stated that its responsibilities were first, to keep the criminal docket current, meeting the demands of the Speedy Trial Act; second, to bring the Covington civil docket current; and third, to assist in the

other divisions of the court in meeting the backlog of cases there. It was pointed [4] out that many of these were black lung and social security cases, in which the litigants had been living for years, some in utter destitution, waiting for their cases to be resolved. The court emphatically stated to the United States Attorney, in so many words: "These people have rights, too."

4. The court further informed the United States Attorney that he himself had an ethical duty not only to prosecute criminal cases but, where it could be done without prejudicing the prosecution of these cases, to cooperate with the court in discharging its responsibilities to all the litigants with cases on its docket. To this end, the court insisted that certain practices to expedite the criminal cases should be instituted. Among these were the holding of pre-trial conferences and the filing of trial briefs in every criminal case; the anticipation of, and preliminary hearings on disputed questions of evidence; liberal interpretation of the discovery requirements of F.R.Cr.P. 16; and most important of all, the early production of Jencks Act statements.

5. The United States Attorney at that time reluctantly agreed to cooperate with the court in the above matters. More specifically, he agreed to furnish Jencks Act statements, at the latest, the night before the witness was to testify and earlier if he did not deem it unduly prejudicial to his case. The court finds that this has been probably the most time saving of all the practices which were followed up until the time the United States Attorney declined to continue cooperating with the court in this respect.

6. During the period of cooperation, the court has disposed of 34 criminal cases involving 44 defendants, of which six cases required actual trials. This was done without encountering any problems with the Speedy Trial Act. While many of the cases

---

**3.** Such facts as are not in this record are judicially noticed. F.R.Ev. 201.

**4.** Approximately 300 of these cases were transferred to this division, after this opinion was

filed. All of these were filed in court in 1976, which means the original claims were filed years earlier. Further transfers are expected.

actually tried were quite serious, none could be considered unduly complex. Nevertheless, the court finds that by reason of early production of the Jencks Act statements, these trials were shortened by an average of one–third to one–half.

7. In addition, because of these procedures, including early production of Jencks Act statements, many guilty pleas resulted, although plea bargaining was not employed.

8. Further, the court was able actively to supervise the civil docket, to the extent that 112 civil cases were disposed of, and the civil docket at Covington was brought current so that the court now is able to assign trial dates 90 days in the future, and sometimes less. Many of the cases which the court was able to resolve on the Covington docket were Civil Rights cases, several of which involved persons who allegedly had been deprived of their Civil Rights in being discharged from public employment. The oldest of these cases was filed in 1976. Approximately 20 black lung and social security cases were on the docket of the Covington division when the present judge took office, all of which were decided within approximately 90 days.

9. Further, the court was able to accept assignments from the Pikeville docket from the Chief Judge of the District, who is greatly concerned about these problems.[5] One of these was a complex case involving a mining disaster, which the court was able to set for trial within six months of the assignment and which because of the trial setting was ultimately settled without trial.[6] This case involved wrongful death actions brought by the families of 15 miners, and had been pending for approximately four years.[7]

10. If the United States Attorney insists upon literal compliance with the Jencks Act, the practical result is that a recess must be taken at the conclusion of the direct examination of every witness. Indeed, the court would very likely abuse its discretion if it refused to grant a recess.[8]

11. At the oral argument in the present case, the United States admitted that, in cases where the Jencks Act is literally complied with, frequently recesses of 20 to 40 minutes at the conclusion of the direct examination of each witness must be taken to give defense counsel an opportunity to study the statements, and to consult with their clients about them.

12. The court finds that, had it not been for the implementation of the above–described policies in criminal cases, of which early production of the Jencks Act statements is an essential part, the court would have been able only to handle the criminal docket at Covington, barely meeting the demands of the Speedy Trial Act, and would not have been able to make any substantial inroads on the civil docket, even of the Covington division, much less to assist with the overburdened docket at Pikeville.

13. Because of the so–called "white collar program" now being pursued by the

---

5. It must be noted that until December 1979, there were only three active judges to service the six widely dispersed divisions of this court. Some were on the road more than 50 percent of the time. It was truly an impossible task for them to do more than deal with the criminal dockets and handle some pressing civil cases. Nevertheless, their accomplishments were herculean and achieved only with the utmost dedication. Two of them sacrificed their health in the service of this court.

6. This case was the aftermath of *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655 (6th Cir. 1979).

7. The court recently held two days of pre–trial conferences at Pikeville in other cases reassigned to this division, having originally set 20 cases for pre–trial conference. As a result of the settings, five of these cases were settled. The oldest case actually pretried was filed in 1975, and the court was able to set it for trial on October 31, 1980. One case involved a National Guardsman who was totally disabled in an accident in which the bulldozer he was operating encountered a high–pressure gas line. Another was a products liability case, in which the plaintiff is a young man of college age, who was rendered a paraplegic in a football accident. Needless to say, the resolution of these cases is important not only to the plaintiffs but to the defendants as well.

8. *See* 18 U.S.C. § 3500(c), quoted in note 33, *infra*.

Justice Department, criminal cases have grown noticeably more complex. It has been stated of record by the Office of the United States Attorney in several of the cases on this court's docket that they will take two, three, or four weeks to try. In one such case the United States Attorney's office has informed the court that approximately 80 witnesses will be called. In another the estimate is 30 witnesses. In the present case the estimate was 20 witnesses. Many of these witnesses are really experts, such as accountants, although they are also agents of the government.

16. Much of the evidence in these cases is voluminous documentary evidence, and much of the testimony, even of non–experts, involves matters of interpretation and opinion.[9]

17. The court finds that literal application of the Jencks Act, as insisted upon by the United States Attorney in this case, and in future cases, would involve taking a lengthy recess at the conclusion of each witness called by the prosecution. These recesses were estimated by the United States Attorney to be of approximately a half–hour's duration. Thus, in the case involving 80 witnesses, a delay of 40 hours or almost seven additional trial days would be required. In the case involving 30 witnesses, at least 15 hours of recesses would be required, and probably more, because of the extreme complexity of that case. An attorney cannot be expected to prepare the cross–examination of an expert on a complicated matter during a trial recess. Frequently, consultation with other experts and extensive technical and legal research is required to prepare for such cross–examination in any meaningful way.

18. The court takes judicial notice of the fact that other criminal cases, of even greater complexity, some involving alleged election frauds, some involving alleged conspiracies to engage in official corruption, and others involving other types of alleged white–collar conspiracies have already appeared on the dockets of other divisions of this court, and are to be anticipated on the docket of this division. It is not improbable that this court might be called upon to assist with those cases. If the United States Attorney prevails in this matter, it will be unable to do so.

19. The court further finds that, unless it aggressively exercises its inherent and supervisory powers, and those powers granted to it under the Federal Rules of Evidence, the demands of the criminal docket would be met only with the greatest difficulty, and there will be not only a substantial but an entire denial of justice to literally several thousand litigants with cases backlogged in the various divisions of this court. So that the record may be clear that this is not an extreme statement, pertinent statistics are set forth below.[10]

20. The court finds that adherence to the order entered in this case, and those which the court anticipates entering in other criminal cases, is necessary to the court's ability to discharge its constitutional and ethical duties to the litigants before it, both criminal and civil. The court finds that the newly–adopted policies of the United States Attorney will effectively result in the court's inability to fulfill those responsibilities.

---

9. For example, in one case, an issue is whether or not a business was losing money, which is relevant as a possible motive for the commission of arson. This involves expert testimony on the financial records of the company. Another case involves the alleged acceptance of bribes or kickbacks by a public official. The kickbacks are alleged to have been made by an arrangement whereby a contract was let for services to a public housing authority, which services were allegedly never received. Proof in the case requires the analysis of financial and business records of the housing authority and the company rendering the services. Again, the evidence involves much expert interpretation.

10.

CASES PENDING

| | CIVIL | CRIMINAL |
|---|---|---|
| Covington | 202 | 51 defendants |
| Catlettsburg/Ashland | 375 | 12 defendants |
| Lexington | 1117 | 20 defendants |
| Pikeville | 1120 | 22 defendants |
| London | 1309 | 39 defendants |
| Lexington | 5 | 16 defendants |
| Covington (Beverly Hills) | 54 | |

21. The court further finds that the failure of the United States Attorney to adopt modern procedures and policies for the expedition of criminal trials is a substantial cause of the backlog now existing in this district, and unless the court is empowered to supervise actively the practices of the United States Attorney, the backlogs may be expected to markedly increase.

22. The court expressly finds that criminal defendants in this and other cases are denied effective assistance of counsel and due process of law in situations where several defense attorneys are expected to analyze Jencks Act statements and reports during recesses.

23. Further, defendants whose trials are delayed are denied the right of reasonable bail and a speedy trial.

24. Because the burden is more onerous on the poor and black defendants, who are more frequently represented by less experienced counsel, and unable to raise bail, there is a denial of their right of equal protection.

25. The court further finds that not only criminal defendants but other litigants in civil cases [11] will be deprived, as a result of the policies of the United States Attorney, of their constitutional rights to a speedy trial, meaningful access to the courts, and equal protection of the laws.[12]

26. The record must be clear that the court has always made it a part of its policy to consider exceptions to its discovery requirements, including early production of the Jencks Act statements, in cases where the United States Attorney represents to the court that any witness is in danger of intimidation, or there exists any special circumstance, not necessarily extraordinary, in which the order of the court should not be implemented. The court finds that production of the Jencks Act statements of

---

[11]. This court like other federal courts has before it many cases in which citizens claim that they have been deprived of significant constitutional rights, for which they are looking to the court for redress in the form of injunctive relief or damages. Among these cases are several involving public employees who claim that they have been discharged in violation of their First Amendment or due process rights. Other actions have been brought by or on behalf of prisoners who look to the court to alleviate alleged cruel and inhuman conditions under which they are confined. In two of these cases the court has been asked to close county jails, or order the elected officials of the counties involved to appropriate public monies for the improvement of existing conditions. These are matters of great public importance, not only to the nominal parties but to the taxpaying citizen.

Some litigants claim that they have been assaulted or otherwise wrongfully deprived of their constitutional rights by police officers. Some claim that such actions were taken because of their race. Assuming that some of these actions are meritorious, again, it is the poor and the black who will be deprived of justice, if the power of the court to take whatever measures are necessary to decide their cases is not recognized. Other litigants before the court claim that they have been discharged from private or public employment by reason of invidious motives based upon sex, race, or age. The labors of Congress and Civil Rights advocates to enact the laws guaranteeing such persons their equal rights and the ability to vindicate those rights in court will be totally worthless if their cases can never be heard.

The court also takes note of the plight of litigants before the court in more traditional types of civil cases, especially personal injury cases. Many of these litigants are suffering financial hardships because their cases cannot be heard. The defendants, too, have the right to have the claims against them determined without having to live with an unsettled situation for endless years while their cases gather dust. The court knows from experience as a trial attorney that if one must either bring or defend a suit involving large sums of money, it may disrupt that person's entire life and deprive him or her of peace of mind for extended periods of time.

The court also takes judicial notice of the expense involved in litigation, both civil and criminal, where, because of long delays and uncertainty of the condition of the trial docket, cases must be set for trial and continued again and again. At the time of each continuance, the file is put away and needless time is expended re-examining it when it is again taken out. Depositions must be updated, witnesses re-interviewed, and briefs re-written. A corresponding waste of judicial time and additional expense to the litigants and taxpayers also result.

[12]. "It is to the federal courts–and sometimes to the federal courts alone–that plaintiffs with this sort of complaint must look to find redress. *Rowser v. Miller, Receiver*, No. 78–3212 (6th Cir. September 26, 1980.) (Merritt, J.)

government agents and police officials, many of whom are testifying in an expert capacity, five days before the beginning of trial, and of other witnesses the night before they testify, when exceptions as above described are willing to be made by the court, will in no way prejudice the prosecutions of criminal defendants by the United States, either in this case or any other case now on the court's docket, of which the court is aware. In the event in some future case any such prejudice is shown, the court is willing to entertain motions on the part of the United States Attorney for exceptions to the court's policy. The United States Attorney was given an opportunity at the oral argument on the motion now before the court to advise the court of any prejudice to the United States from following the court's order, and was unable to do so. Indeed he could hardly do so inasmuch as his conviction record and his records of affirmance on appeal during the period he was cooperating with the court was 100 percent. The court is advised that many, if not most, United States Attorneys do not insist on literal compliance with the time limitations of the Jencks Act. Interestingly enough, a leading case interpreting the Jencks Act recites that the materials were furnished in advance of the trial in that case.[13]

27. The court further finds that if the judges of our courts are not permitted to use imaginative and sometimes novel techniques, rather than being tied down by the restrictions of 20 years ago, we will never be able to extricate ourselves from the morass of litigation in which we are now enmired, and the court's ethical responsibility cannot be fulfilled. Today's complex conspiracy cases cannot be tried with the antiquated methods designed for the prosecution of car thieves and the purloiners of welfare checks.

28. The court further finds that, although the United States Attorney is acting in good faith in this matter, he misunderstands the broader responsibilities of his office to assist the court in achieving the "just, speedy and inexpensive determination of every action."[14]

29. The court finds that 21 civil cases assigned to the undersigned judge are set for trial as of the date of this opinion, and that if the United States Attorney is permitted to persist in his policy not to cooperate with the court, all of the trial settings therein will be jeopardized. The continuance in the instant case, for which two trial weeks had been set aside, has already resulted in serious disruption of the court's calendar.

30. As a result of this situation many citizens are being deprived of their constitutional rights, and exposed to needless suffering and distress, and substantial unnecessary expense is resulting to the taxpayers.[15]

THE JENCKS ACT AS CONSIDERED IN PARI MATERIA WITH RULES 102, 403 AND 611 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SUBSEQUENT STATUTES.

Originally, the long–awaited Federal Rules of Evidence were scheduled for adoption by the regular rule–making process existing under the Rules Enabling Act.[16] However, because Congress recognized the importance of the Rules of Evidence, and the drastic changes made by them in pre–existing practices, by the passage of a special act[17] it withdrew the Rules from the ordinary rule–making process, so that more detailed consideration could be given to them. After exceedingly careful scrutiny by Congress, which resulted in changes in

---

13. *Goldberg v. United States*, 425 U.S. 94, 100, 96 S.Ct. 1338, 1343, 47 L.Ed.2d 603 (1976).

14. F.R.Civ.P. 1; *Cf.* F.R.Crim.P. 2; F.R.Ev. 102.

15. We have not precisely determined the cost of one trial day, but $1,000 is a conservative figure.

16. 28 U.S.C. § 2072. *See Boggs v. Blue Diamond Coal Co.*, 497 F.Supp. 1105, (E.D.Ky. 1980); Saltzburg & Redden, *Federal Rules of Evidence Manual 5* (1977 Ed.).

17. Act of March 30, 1973, Pub.L. 93–12, 87 Stat. 9.

many of the proposed rules, the Federal Rules of Evidence, substantially in the form now existing, were adopted by another special act.[18]

█ Being enacted by special act of Congress, after such careful study, the Federal Rules of Evidence, when construed in the light of standard rules of statutory construction,[19] supersede or implicitly amend previous enactments contrary to them.

Among the Federal Rules of Evidence, are Rules 102, 403, and 611(a) which read respectively as follows:

**"Rule 102. Purpose and Construction.**

These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

**"Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**"Rule 611(a). Control by Court.**

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

These three rules are fundamental components of the scheme enacted by the Federal Rules of Evidence, the general thrust of which is to vest the trial judge with wide discretion to structure the trial so as to reach a just result without an undue expenditure of the time of the court, jurors, witnesses and litigants.

One leading commentator on the new evidentiary code has stated concerning Rule 102:

"The generally expanding modern policy of judicial discretion, applicable to evidence as to other procedural matters, is acknowledged and tacitly endorsed by Rule 102. Its aims may therefore require particular attention when judges are called upon by express provisions in other Rules to exercise discretion. The most obvious of these are Rules 401 (Definition of 'Relevant Evidence') and 403 (Exclusion of Relevant Evidence on Grounds of Prejudice, etc.)

" 'Fairness in administration'–the first of the stated aims of Rule 102–is obviously a pervasive value in all the law of evidence and has been recognized as such."[20]

The same commentator has also stated, concerning Rule 403:

"The authority of the trial judge to exclude even relevant evidence on account of the 'considerations' set forth in Rule 403 (undue delay, waste of time, or needless presentation of cumulative evidence) serves vital and immensely practical societal interests. *The trial court's time is a public commodity which should not be squandered.* Witnesses and jurors have private lives, and ought not to be called upon to serve for longer than is necessary reasonably to resolve disputes in both the criminal and civil spheres. *A tireless (perhaps resourceful) adversary should not be allowed unlimited freedom to wear down his opponent by repetitious proof or unnecessary waiting periods. In short, Rule 403 is Federal Evidence law's*

---

**18.** Act of January 2, 1975, Pub.L. 93–595, 88 Stat. 1926.

**19.** *See* note 34, *infra* for a discussion of the applicable rules of statutory construction.

**20.** Louisell & Mueller, *Federal Evidence* § 3. (Emphasis added).

*answer to the adage, 'Enough is enough.'* "[21]

The enactment of these Federal Rules of Evidence gave these principles statutory status, which, inasmuch as the Rules were enacted subsequent to the Jencks Act, superseded it, to the extent it was inconsistent with them.

Rule 102 fully supports this court's interpretation of Rule 403 with regard to the problem presented in this case. As indicated by the findings of fact herein, the court must have the power to supervise and actively and aggressively expedite the presentation of both civil and criminal cases, in order "to secure fairness in administration" of the cases before it, and "elimination of unjustifiable expense and delay." Rules 102, 403 and 611 are to be construed, not only with the particular case before the court in mind, but from the perspective of managing the docket, as a whole. Permitting criminal cases, albeit complex ones, to preempt the entire docket because of bureaucratic inertia results in a failure to secure fairness in administration and elimination of unjust expense and delay not only in the case at bar but in other cases of great importance to the litigants and public, which will never be reached.

Rule 102 also recognizes that the Rules of Evidence are a code of general principles which can be further implemented by the decisions of courts in particular cases. By enactment of this rule Congress intended that the court has some discretion to modify Rules of Evidence to promote "growth and development of the law of evidence." It is hoped the ruling of this court made today fulfills this salutary goal. Certainly, it furthers "the end that the truth may be ascertained and proceedings justly determined." If the court can never reach a case, the truth concerning the issues in it can never be ascertained, and obviously the proceeding can never be determined, justly or otherwise. Although a truism, it is nevertheless a remorseless principle that justice delayed is justice denied.

Turning to Rule 403, we find that the salutary precepts generally enunciated in Rule 102, are specifically implemented. The policies adopted by the Rule are largely a result of the proliferation of litigation since the adoption of the Jencks Act in 1959.[22]

The goals of Rule 403 are far broader than the admission or exclusion of evidence in a particular case. A comprehensive commentary on the subject states:

"The prejudice rule speaks to three general goals: avoidance of misdecision by the factfinder; promotion of real and perceived fairness in the judicial process, an institutional goal; and achievement of an economical factfinding process. When the prejudice rule is reduced to its components and the intent of each of those components analyzed, these three goals are easily recognizable. The rule's consideration of unfair prejudice, confusion of the issues, and misleading the jury addresses the first two goals, while the consideration of undue consumption of time implements the third. We can fairly pass over *the goal of achieving a more economical factfinding process as obvious, specific, time–honored, and universally accepted.*"[23]

Although the Rule speaks of relevant evidence, it refers to all evidence which would otherwise be admissible and is not merely concerned with problems of relevance.[24]

The plain language of the rule specifically states that its application is universal. "The prejudice rule in the federal form is stated with no limitations. This unqualified formulation would seem to indicate

---

**21.** *Id.* § 128. (Emphasis added.)

**22.** *See* Dolan, "Rule 403: The Prejudice Rule in Evidence," 49 S.Cal.L.Rev. 220, 224 (1976) [hereinafter Dolan]. For a discussion of the manner in which this explosion has affected the judicial workload in this district, see the findings of fact, *supra.*

**23.** *Id.* at 226. (Emphasis added).

**24.** *Id.* at 231.

that any piece of evidence which runs afoul of its terms may be excluded." [25]

With regard to the provisions of the rule concerning undue delay and waste of time, the proper construction is that such language refers to all evidence which necessitates undue consumption of time.[26]

In applying the Rules to achieve this goal, not only the particular case may be considered but also economies of trial and crowded calendars. The waste of time criterion

"can be used to limit the number of witnesses, to restrict the amount of questioning on a particular point, to halt the amount of evidence, *or to achieve any other goal that finds its basis in considerations of time.*" [27]

■ In the exercise of its discretion under Rule 403 the trial court may, to prevent waste of time, set an absolute time limit for the presentation of a party's case,[28] curtail time for cross–examination,[29] restrict the scope of rebuttal evidence,[30] or, in short, take any other measure to meet its ethical responsibility to dispose of the court's business in a reasonable time, subject only to review for abuse of discretion.[31]

■ Inasmuch as the drastic sanction of exclusion of the evidence is expressly provided for in Rule 403, the less drastic sanction of compelling compliance with conditions to remove or alleviate the prejudicial or time–wasting aspects of the introduction of the evidence is also authorized.[32]

■ The court in the exercise of its discretion may also take into consideration the cooperation of counsel in eliminating the undue prejudice or time–wasting aspects of the evidence, and may require that the evidence be introduced in a manner designed to remove these undesirable factors.[33]

By its approval of Rules 403, 611 and the other Federal Rules of Evidence, Congress approved the traditional and fundamental recognition of the "judge's power to control the progress and, within the limits of the adversary system, the shape of the trial" [34] and

"the important role the trial judge plays in the federal system of criminal justice. *[T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct...* The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexity and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion... Within limits, the judge may control the scope of rebuttal testimony... [and] may refuse to allow cumulative, repetitive, or irrelevant testimony ... and may control the scope of examination of witnesses.... If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings." [35]

Rule 611 incorporates all of these principles.

25. *Id.* at 269.

26. *Id.* at 242.

27. *Id.* at 243. (Emphasis added).

28. *SCM Corporation v. Xerox Corp.*, 77 F.R.D. 10 (D.Conn.1977).

29. *United States v. Zarattini*, 552 F.2d 753, 759 (7th Cir. 1977).

30. *Bowman v. General Motors Corporation*, 427 F.Supp. 234, 239–240 (E.D.Pa.1977).

31. *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976).

32. For example, the court may "sanitize" documents. *See Dolan, supra* note 20, at 254, and cases there cited.

33. *United States v. King*, 560 F.2d 122 (2d Cir. 1977) *cert. den.* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977).

34. *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976).

35. *Id.* at 86, 96 S.Ct. at 1334–35 (Emphasis added.)

Further, by its adoption of Rules 403 and 611, Congress approved the underlying premise that

"The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." [36]

The passage of Rules 403 and 611 by Congress was a statutory enactment of the common law doctrine that a court has inherent power to control its calendar.

"The trial court's discretionary authority [under Rule 403] to exclude evidence for considerations of 'undue delay' is a particular example of his more general power to control the calendar of his court." [37]

The court's exercise of this discretion, as granted under these statutory Rules is not only justified but virtually compelled in this case. The court has not excluded the evidence, but merely required that the time—wasting factors involved in it be removed, by ordering the Jencks Act statements produced slightly earlier than would otherwise be required. It has not ordered production of anything not required by the Jencks Act. The United States is in no way prejudiced, but if the court did not so exercise its discretion, there would be unfair prejudice not only to the defendants in this case, but also to the other litigants at the bar of the court, as discussed in the findings of fact, *supra*.[38]

The United States Attorney, in taking the position herein described, relies on the timing provisions found in the Jencks Act, 18 U.S.C. § 3500, which requires that a "statement" of a witness be ordered produced to defense counsel only after a witness called by the United States has testified on direct examination.[39]

---

**36.** *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). Long recesses between the direct and cross—examination of a witness, or hastily prepared cross—examination result in confusion of the jury. Further, evidentiary problems, which could otherwise have been anticipated, arise unexpectedly leading to long bench conferences and increasing the possibility of error, which also confuses the jury, if it occurs.

**37.** Louisell & Mueller, *Federal Evidence* 46. The inherent power of the court is discussed below.

**38.** Courts have long recognized that literal adherence to the time limitations of the Jencks Act results in unfair prejudice. The passage of Rules 403 and 611 gave the courts discretion to correct the situation. *See e. g. United States v. Moceri*, 359 F.Supp. 431 (N.D. Ohio 1973).

**39.** 18 U.S.C. § 3500 reads in its entirety as follows:

"Demands for production of statements and reports of witnesses.

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said de-

The Jencks Act was adopted in 1959. At that time, the court recalls, the entire docket in the Covington division of this court was handled by one judge who came to town two weeks in the spring and two weeks in the fall, in which time he was able to dispose of the entire civil and criminal dockets. The present writer, who came to the bar in 1961, was appointed to defend many of the criminal cases in the court in those years. The custom was for the Clerk of the Court to get on the telephone and call all of the young attorneys on the first day of the term with the message, "The judge wants to see you." When the young attorney arrived, instead of engaging in a tete–a–tete with the eminent occupant of the bench, he was told to stand with one or more defendants and defend them, and that the cases were going to trial that afternoon or the next morning. No compensation or expenses of the attorney were paid.

The bulk of the docket consisted of charges of interstate transportation of stolen motor vehicles, primarily involving youths joy riding in cars driven across the state line from Cincinnati; thefts of checks from the mail; some embezzlements from federally–insured savings institutions, all of which resulted in guilty pleas; and an occasional bank robbery. In all the cases in which he was appointed, the court does not recall any trial which took more than two days, and most were conducted in half a day. All the witnesses in all the cases appeared on the first day of the term, and the court tried the cases in rapid succession as fast as they could be reached. During the two–week period, the court was also able to call the civil docket and try most of the civil cases, and entertain the assembled members of the bar with a few good stories and witticisms in the process.

At the time the Jencks Act was passed, men had not yet walked on the moon; there was no international airport located in Northern Kentucky; few practicing lawyers had ever heard of a § 1983 Civil Rights case, much less filed one; the black lung laws had not yet been passed; it was almost unheard of to sue a doctor for medical malpractice; if a teacher was fired, she looked for another job instead of filing suit; the Civil Rights Act and the Sex and Age Discrimination Acts were as unknown as the pocket calculator; there was no such thing as strict liability in products cases; suppression hearings were seldom, if ever, held; cases involving busses were usually brought by people who had been hit by one; the interstate highway system was not yet built in this part of the country; the few class actions were brought by simply alleging that the plaintiff represented himself and all others similarly situated; and the Justice Department's white–collar program was not yet even a cloud as big as a man's hand on the horizon.

In short, in those comparatively halcyon days the litigation explosion had not yet occurred. The drafters of 18 U.S.C. § 3500 could never have envisioned the situation with regard to the dockets and work of the federal courts as it exists today. Certainly, they would never have conceived of the situation as it exists in the Eastern District of Kentucky. Although it is true that the act could have been subsequently amend-

fendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under Paragraph (b) and (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

ed,[40] it would be impossible for Congress to determine the extent to which its time limitations should be required to be relaxed on each federal docket in the nation.

This court holds that Congress, in adopting the Federal Rules of Evidence, intended to cope with the litigation explosion, not by tinkering with the provisions of a host of myriad statutes which might have some effect on court proceedings, but by giving the federal district courts broad discretion to manage the dockets in their individual districts, including discretion to relax the literal time requirements of the Jencks Act.

The Jencks Act must be read *in pari materia* with the Evidence Rules and other acts of Congress.[41] Among such other acts are the Speedy Trial Act in which Congress emphatically commanded the courts to begin the trials of criminal cases within 70 days of the indictment, except in exceptional circumstances. Each district court was required to produce a written plan so that that end might be achieved. The burden of the docket was not considered an excuse for failure to meet this demanding criterion.

The Speedy Trial Act evidences not only legislative intent but a legislative directive

**40.** As of December 1, 1980, new F.R.Cr.P. 26.2, became effective, which has the effect of amending or repealing the Act. See addendum *infra.*

**41.** The application of accepted principles of statutory construction is this: The Jencks Act and the other statutes referred to in the text of the opinion, being equally specific and addressed to the same or allied subjects, and being part of the same general scheme or plan and aimed at "the accomplishment of the same results, and the suppression of the same evil," must be construed *in pari materia*; that is, not as "isolated fragments of law, but as a whole, or as parts of a great, connected, homogenous system" and "as if they constituted but one act." Sections of one law may be considered as if they were parts of the other. 73 Am. Jur.2d, Statutes §§ 188, 189.

Where statutes such as F.R.Ev. 102, 403 and 611, and F.R.Cr.P. 2, and 17.1, are clear on their face, and, when standing alone, are susceptible to but one construction, the courts will adopt that construction and refuse to consider prior statutes on the same subject, such as the Jencks Act. *Id.* § 192. "Moreover, in case of inconsistency between an earlier and a later act on the same subject, the later act controls. Especially is it true that the earlier act cannot be looked to in order to determine the meaning of the later, if the words of the subsequent act or the circumstances under which it is enacted evince a changed intention on the part of the legislature." *Id.* Since the subsequent statutes discussed in the text, *supra,* evince a changed intent on the part of Congress, to the end that the court have plenary power, subject to review only for abuse of discretion, to supervise its calendar and the trial of individual cases to effect savings of time and promote the interests of justice, the earlier Jencks Act must yield, to the extent inconsistent therewith.

When the Jencks Act is construed *in pari materia* with the other statutes mentioned, an ambiguity is created, "justifying the interpretation of [the] statute," with respect to the time limitations, because they are inconsistent with both the specific provisions and the intent of the subsequent acts, that justice be afforded to all by the federal courts, and that speedily. *Id.* § 195.

Further, an ambiguity justifying judicial construction of the Jencks Act arises from the fact that giving a literal interpretation to the Act would lead to "unreasonable, unjust, impracticable, [and] absurd consequences as to compel a conviction that they could not have been intended by the legislature." *Id.* Those readers who have toiled with the writer to this point in the opinion are aware that such consequences have been fully discussed herein. The concept of a trial judge without the ability to control his courtroom and the personnel of his court, in fulfillment of the ethical duties expressly imposed on him is absurd indeed.

Further, it is literally hornbook law that a statute must be construed, if possible, to avoid constitutional problems, especially those involving conflicts between the independent branches of the government. *See* L. Tribe, American Constitutional Law 56 (1978). The constitutional problems resulting from literal application of the Jencks Act, are discussed in detail, in the body of this opinion. They are avoided by this court's construction of that statute *in pari materia* with the Federal Rules of Evidence, and the other statutes mentioned.

Also, where the legislative intent is obviously to promote constitutional rights, even the most specific black letter of statutes may be broadened to promote that end. *Cf. United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

All of the above principles may be summed up in the cardinal principle that even the most specific statute must be interpreted to effectuate overall legislative intent, where literal application of its terms would defeat that intent. This was the approach of one of the greatest judges of our era. *See* K. Griffith, *Learned Hand and the Role of the Federal Judiciary,* Chapter IX (1973). *Cf. United States v. Oates,* 560 F.2d 45, 75ff. (2d Cir. 1977).

that the courts actively manage their dockets and use all necessary means to dispose of the cases before them. Certainly, any individual judge can have a plan, just as any district may, where circumstances in the individual district vary. Since many other acts of Congress passed since 1959 vested the federal courts with additional jurisdiction and responsibilities, it was the intent of Congress that the demands of the civil docket also be met. The most striking manifestation of this intent is Congress' creation of more than 150 federal trial judgeships.

Congress was also undoubtedly aware of ethical imperatives of Canon 3 of the Code of Judicial Conduct[42] that the court *insist* that its officials cooperate with it in handling its business with expedition. Rules 102, 403 and 611 of the Federal Rules of Evidence mean little if they do not empower the court to fulfill its ethical obligations.

The Jencks Act, when read *in pari materia* with these enactments must be read as permitting the court to exercise its discretion to adjust the time limitations thereof, at least to minor extent done here, considering the utter inability of the court to discharge its obligations otherwise.

## THE CONSTITUTIONAL RIGHTS OF LITIGANTS AND THE INHERENT POWER OF THE COURT.

Indeed, the Jencks Act has never been literally applied, where there were compelling countervailing constitutional considerations.

The leading authority in this circuit dealing with the issue specifically holds that the literal application of the Jencks Act must yield where its practical effect would be to deny litigants their constitutional rights. *United States v. Narciso.*[43] This court concurs entirely with the scholarly treatment of this issue there set forth.

That case involved, as does the instant case, the effective denial of due process and effective assistance of counsel to defendants in a complex criminal case, by insistence of the United States on a literal application of the time frame of the Jencks Act. Judge Pratt there stated with ineluctable logic:

"It is axiomatic that when fundamental constitutional guarantees are involved, the statutes of Congress must give way to the enforcement of the constitutional right. In *U. S. v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court held that a presumptive privilege 'fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution

... must be considered in light of our historic commitment to the rule of law. This is nowhere more profoundly manifest than in our view that 'the two–fold aim [of criminal justice] is that guilt shall not escape or innocence suffer.' *Berger v. United States,* 295 U.S. [78] at 88, 55 S.Ct. 629 [at 633], 79 L.Ed. 1314. We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. 418 U.S. at 708–9, 94 S.Ct. at 3108.

"While the Chief Justice was referring in *Nixon* to the necessity of producing evidence at trial, the principle is the same: *when two principles of law conflict with one another the criminal justice system demands that the principle favoring greater discovery in favor of the accused must prevail, particularly where, as here, the principle favoring disclosure is of constitutional origin.*

**42.** Quoted note 1, *supra.*

**43.** 446 F.Supp. 252, 270–71 (E.D.Mich.1977).

"Upon consideration, the interests of due process of law, effective assistance of counsel and the fair and efficient conduct of criminal trials require that *in the very particular facts of this case, the time restrictions of the Jencks Act must be overridden.*" (Emphasis added.)

Although the case at bar is not as complex as that before Judge Pratt, the court has found that the denial of the same constitutional rights will result herein because of the heavy reliance of the United States on analysis of voluminous documents, the fact that much of the proof of the prosecution must rest on what is essentially expert testimony, and the complexity of the issues. The same situation also exists in several other cases on the docket of this court, discussed in the findings of fact herein.

Although Judge Pratt was primarily concerned with the constitutional rights of the defendants before him, the constitutional rights of other criminal defendants and other litigants must also be considered, and they also will be abridged as has been found.

Citizens have a constitutional right to access to the courts,[44] and to live their lives without having them needlessly entangled in governmental red tape, and harassed with technicalities. This court is determined that the red tape can and will be trimmed to the minimum required by orderly procedure.

Just as Judge Pratt found that, in the very particular facts of the case before him, the time restrictions of the Jencks Act "must be overridden," this court finds that they must also be overridden by reason of the very particular facts existing with regard to the dockets in this district, as have been described in this opinion.

■ The court also holds that it has inherent power to insure that its dockets are managed in such a way that it can fulfill its ethical responsibility to bring substantial justice reasonably promptly to the people of this district. As Judge Pratt said so well in the case above cited:

"Courts have long recognized that they have inherent power *not limited by statute or rule* to insure that due process of law is provided and that criminal trials are fair and efficient. *U. S. v. Jackson,* 508 F.2d 1001 (7th Cir. 1975); *U. S. v. Cammisano,* 413 F.Supp. 886 (W.D.Mo. 1976); *U. S. v. Germain,* 411 F.Supp. 719 (S.D. Ohio 1975); *U. S. v. Winchester,* 407 F.Supp. 261 (D.Del.1975)." [45]

The same principle applies here, considering both the instant case and the docket as a whole, and applies to civil as well as criminal cases. This inherent power was the basis of the decision of our Court of Appeals which recognized that a trial court has power to order production of a witness list in a criminal case, although this procedure is not expressly permitted by F.R.Cr.P. 16.[46]

As Chief Judge Lord of the Eastern District of Pennsylvania has pointed out:

"We begin with certain fundamental concepts: (1) a trial judge with an individual calendar is charged with the duty of moving his cases expeditiously; (2) to do so, he must have the power to order time limitations and to see to it that the deadlines contained in the Federal Rules of Civil Procedure are enforced; (3) he must have wide discretion to impose sanctions, without which he is helpless to enforce the exercise of his power under (2). *'The conception of a court helpless to control its calendars is a hopeless one.'* *Gamble v. Pope & Talbot, Inc.,* 307 F.2d 729, 735 (3d Cir. 1962) (Biggs, Ch.J., dissenting).[47]"

If a United States District Court can desegregate school systems and take over

---

44. *Cf. Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

45. *Id.* at 270. (Emphasis added.)

46. *United States v. Kendricks,* 623 F.2d 1165 (6th Cir. 1980).

47. *Riverside Memorial, Etc. v. Sonnenblick–Goldman,* 80 F.R.D. 433 (E.D.Pa.1978). (Emphasis added). The same principle applies to all rules of evidence and procedure.

penitentiaries, surely it has inherent power to prevent one of its attaches, by pursuance of an ill–considered policy, from causing the vast majority of the litigants before it to be deprived of substantial justice.[48]

■ The court also holds that the United States Attorney has an ethical and moral duty to cooperate with the court, if the prosecution will not be unduly prejudiced, in discharging its ethical responsibilities, as stated in Canon 3 of the Code of Judicial Conduct.[49]

## CONCLUSION

This court holds that the Jencks Act is not to be looked upon in isolation; rather, it is imperative to the administration of justice, to construe this Act in conjunction with more recent enactments of Congress, including the Federal Rules of Evidence, the Speedy Trial Act, and ethical duties.

■ This court holds that the Jencks Act is implicitly amended to permit the implementation and the goals of Rules 102 and 403 of the Federal Rules of Evidence; that is, to secure fairness and eliminate unjustifiable expense and delay. Therefore, the court may in its discretion adjust the time limitations of the Act, taking into consideration the facts of each case and the potential prejudicial effect therefrom, both on the case before the court and the docket as a whole, in order to effectively carry out the functions and duties of the court. The court may also use its inherent powers to effectuate the same end.

■ In the present circumstances the court was empowered and justified in exercising its discretion with regard to the production of Jencks Act statements in the manner described.

ORDER ACCORDINGLY.

## ADDENDUM TO OPINION

The court notes that pursuant to. P.L. 96–42, F.R.Cr.P. 26.2, a new Rule, became effective on December 1, 1980. This new Rule supplants the Jencks Act which was the subject of the court's opinion herein. The text of the new Rule appears at p. 623 of West's paperbacked volume of the Federal Rules of Criminal Procedure (1979 ed.). A copy is attached for the convenience of the parties.

The reasoning of this court in holding that it has discretion to order early production of Jencks Act statements is even more clearly applicable to Rule 26.2 statements. Although the principal object of the new Rule is perhaps to amend the old Jencks Act to require production of the statements of *defendant* witnesses, as well as prosecution witnesses, the new Rule's revision of the old Act also ratifies this court's approach to the timing of the production of the witnesses' statements.

The first paragraph of the old Act provided that production of the witnesses' statements should not be made until after the

---

**48.** *Cf. Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974), quoted *supra* in text accompanying note 36.

**49.** Quoted *supra* n. 1. *See Annotated Code of Professional Responsibility* Canon 8 EC 8–1 and EC 8–2:

"Changes in human affairs and imperfections in human institutions make necessary constant efforts to maintain and improve our legal system. This system should function in a manner that commands public respect and fosters the use of legal remedies to achieve redress of grievances. By reason of education and experience, lawyers are especially qualified to recognize deficiencies in the legal system and to initiate corrective measures

therein. *Thus they should participate in proposing and supporting legislation and programs to improve the system, without regard to the general interests or desires of clients or former clients.*

"Rules of law are deficient if they are not just, understandable, and responsive to the needs of society. If a lawyer believes that the existence or absence of a rule of law, substantive or procedural, causes or contributes to an unjust result, he should endeavor by lawful *means* to obtain appropriate changes in the law. He should encourage the simplification of laws and the repeal or amendment of laws that are outmoded. Likewise, legal procedures should be improved whenever experience indicates a change is needed." (Emphasis added.)

witness had testified on direct examination. This paragraph has been entirely deleted from the new Rule.

The Advisory Committee note to the new Rule expressly states that it was the view of the drafters that the matter of producing witnesses' statements was one of procedure rather than substance, and was most appropriately dealt with in a rule of procedure rather than the criminal code. Thus, the approach of this court in the opinion herein in reading the provisions pertaining to the production of such statements *in pari materia* with the rules of evidence and the criminal rules is even more clearly correct under new Rule 26.2.

The only purpose in deleting the first paragraph of the old Jencks Act would be to add some flexibility to the timing of the production of the Rule 26.2 statements. In making the deletion the drafters must have been motivated by the same concerns this court had when it held that the prohibition of the now–deleted paragraph against early production had become obsolete. The new Rule requires the court to order production of the statements *no later* than after the witness (either prosecution or defense) has testified on direct examination. It no longer purports to prohibit the court from requiring them to be produced at an earlier time. Under basic principles of statutory construction, the deletion of the first paragraph of the old Act, after such careful consideration by the Advisory Committee, the Supreme Court and Congress, must be held to have been intended to repeal the purported prohibition against early production. "If the later act is intended to cover the entire subject, and to be a substitute for the earlier act, the omitted parts are deemed to be repealed by implication." 73 Am.Jur.2d § 408. *See also Id.* § 411:

### § 411.—Repeal by implication.

"As a general rule, the enactment of revisions and codes manifestly designed to embrace an entire subject of legislation operates to repeal former acts dealing with the same subject, although there is no repealing clause to that effect. Under this rule, all parts and provisions of the former act or acts that are omitted from the revised act are repealed, even though the omission may have been the result of inadvertence. Moreover, the application of the rule is not dependent on the inconsistency or repugnancy of the new legislation and the old."

The Advisory Committee note to the new Rule states that it was not intended to discourage voluntary early production of the documents "so as to avoid delays at trial." By reason of the facts stated in this opinion such delays cannot be avoided merely by relying on voluntary disclosure. At a later point in its notes the Advisory Committee also recognizes the inherent power of the court to order production of witness statements. *See United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

Indeed, the word "voluntary" as used in the Advisory Committee note refers to pretrial production, governed by Rule 16. Once the trial begins Rule 16 is no longer applicable and the inherent power of the court and the Federal Rules of Evidence control. *United States v. Nobles*, 422 U.S. at 234–36, 95 S.Ct. at 2168–69. Therefore, the effect of the new Rule is to recognize, in accord with the view of this court, that a trial court in the exercise of its inherent power to control the trial, as implemented by the Federal Rules of Evidence and Criminal Procedure, can regulate timing of the production of the Rule 26.2 statements so as to "avoid delays at trial," where voluntary cooperation during the pretrial stage has not been forthcoming, to achieve the overriding legislative concern of avoiding those delays.

Were such not the interpretation, the evils of leaving the timing of the production of the statements to the uncontrolled partisan discretion of counsel, as catalogued by the court in this opinion, would be multiplied, because now defense statements have to be produced as well, and substantially more recesses would have to be taken, and more unnecessary delay harassment and confusion would result. In the view of this court, now that defense witness statements

are required to be produced, it is even more essential that all problems connected with the production of the statements be taken care of in advance.[1] Otherwise, this court fears that trials will turn into long recesses interrupted by the testimony of an occasional witness.

The court notes in passing that the repeal of the old Jencks Act has probably rendered the appeal herein moot, inasmuch as it remains to be determined whether the parties or the court would take the same position with regard to the production of witnesses' statements, now that the United States has a right to receive statements of defendant witnesses and may be willing to arrive at some agreement with defense counsel for the timing of mutual production of the Rule 26.2 statements that would be satisfactory to the court. This is a matter that addresses itself to the Court of Appeals, however.

## APPENDIX

### Rule 26.2. Production of Statements of Witnesses

(a) MOTION FOR PRODUCTION. After a witness other than the defendant ~~called by the government~~ has testified on direct examination, the court, on motion of a party who did not call the witness ~~the defendant~~, shall order the attorney for the government or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party ~~defendant~~, any statement of the witness that is in ~~the~~ their possession ~~of the United States~~ and that relates to the subject matter concerning which the witness has testified.

(b) PRODUCTION OF ENTIRE STATEMENT. If the entire contents of the statement relate to the subject matter concerning which the witness has testified, the court shall order that the statement be delivered to the moving party ~~defendant~~.

(c) PRODUCTION OF EXCISED STATEMENT. If the other party ~~attorney for the government~~ claims that the statement contains matter that does not relate to the subject matter ~~of the testimony~~ concerning which the witness has testified, the court shall order that it be delivered to the court in camera. Upon inspection, the court shall excise the portions of the statement that do not relate to the subject matter concerning which the witness has testified, and shall order that the statement, with such material excised, be delivered to the moving party ~~defendant~~. Any portion of the statement that is withheld from the defendant over his objection shall be preserved by the attorney for the government, and, in the event of a conviction and an appeal by the defendant, shall be made available to the appellate court for the purpose of determining the correctness of the decision to excise the portion of the statement.

(d) RECESS FOR EXAMINATION OF STATEMENT. Upon delivery of the statement to the moving party ~~defendants~~, the court, upon application of that party ~~the defendant~~, may recess proceedings in the trial for the examination of such statement ~~by the defendant~~ and for ~~his~~ preparation for its use in the trial.

(e) SANCTION FOR FAILURE TO PRODUCE STATEMENT. If the other party ~~attorney for the government~~ elects not to comply with an order to deliver a statement to the moving party ~~defendant~~, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or , if it is the attorney for the government who elects not to comply, shall declare a mistrial if required by the interest of justice.

(f) DEFINITION. As used in this rule, a "statement" of a ~~government~~ witness means:

(1) a written statement made by the witness that is signed or otherwise adopted or approved by him;

(2) a substantially verbatim recital of an oral statement made by the witness

1. *See* F.R.Ev. 104(c). It may be anticipated that there will be a lot of problems as to what the defense must produce since notes of witnesses' anticipated testimony for the defense are more likely to be intermingled with the work product of counsel.

that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof; or

(3) a statement, however taken or recorded, or a transcription thereof, made by the witness to a grand jury.