**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Wayne Franklin TRAYLOR, Ardis May Traylor, and John Horace Andrews, Defendants-Appellants.**

**Nos. 80–1616, 80–1617.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1981.

Decided Sept. 21, 1981.

---

John W. Wolfe, John Henry Browne, Seattle, Wash., for defendants-appellants.

Francis J. Diskin, Asst. U. S. Atty., Seattle, Wash., argued, for plaintiff-appellee; Stanley D. Tabor, Asst. U. S. Atty., Seattle, Wash., on brief.

Before WRIGHT and ANDERSON, Circuit Judges, and TAYLOR,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

## I. OVERVIEW

On March 8, 1980, Drug Enforcement Administration (DEA) agents found approximately 9 pounds of cocaine in handbags carried by Wayne and Ardis Traylor. The cocaine was found during a search of the Traylors' luggage upon their arrival at the Seattle-Tacoma Airport from Los Angeles.

As a result of the arrest of the Traylors, the government apparently became aware of a connection between the Traylors and John Andrews, the appellants, and others. The government's subsequent investigation led to an indictment which charged that the appellants, along with others, had engaged in a conspiracy to import cocaine and a conspiracy to possess and distribute cocaine. The conspiracies were alleged to have commenced from at least the early part of 1978 and continued through March 8, 1980.

In addition to the conspiracy charges, the appellants were indicted on two counts each of the substantive offenses of importing cocaine and possessing cocaine with the intent to distribute.[1] These charges arose out of the March 8, 1980 incident and a December 1978 incident.

The key government witnesses were Cathy McCausland, a friend of Wayne Traylor, and Steve Gable, a friend of Andrews who had been arrested and convicted in California in 1978 after he had attempted to smuggle cocaine into the country. It was essentially through their testimony that the government established the conspiracies between the Traylors and Andrews.

On appeal, appellants raise several assignments of error concerning the search and seizure of the cocaine on March 8, 1980, the admissibility of certain testimony and the sufficiency of evidence. We will consider each issue separately and set forth additional facts accordingly.

## II. DISCUSSION

### A. Search and Seizure

At trial, appellants moved to suppress the cocaine and other items seized by the DEA agents during their search of the luggage and bags of the Traylors on March 8, 1980. The district court denied the motions. The court held that the affidavit submitted by the DEA agent to the magistrate had established probable cause for the issuance of the search warrant; that the luggage and handbags of the Traylors had been properly searched pursuant to the search warrant; that the search of the handbags was proper as searches incident to the arrest of the Traylors; and that Wayne Traylor had voluntarily consented to the search of his luggage and handbag.

We affirm the district court's ruling on the basis that the search warrant was properly issued and the search of the handbags was within the scope of the warrant.

---

* The Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

1. Wayne Traylor and Andrews were convicted on all six counts of the indictment. Ardis Traylor was acquitted on counts III and IV which involved the substantive offenses in connection with the December 1978 incident.

Therefore, we do not consider the other bases for the court's decision.

### 1. *Issuance of the Search Warrant*

 In evaluating the sufficiency of an affidavit for a search warrant, a magistrate need only conclude that criminal activity is probably shown. *United States v. Fried*, 576 F.2d 787, 790 (9th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). Where the affidavit is based, at least in part, on hearsay declarations of an informant, the affidavit must provide facts showing the reliability of the information and indicating the informant's credibility. *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). But, at all times, the affidavit must be read as a whole and given a common sense and realistic interpretation. A magistrate's conclusions will be accorded "great deference." *United States v. Fried*, 576 F.2d at 790–791.

 The affidavit submitted by the DEA agent contained, among other things, information received from a confidential informant. The informant's report was that:

1. Wayne Traylor, John Andrews and Jon Hornback were involved in the trafficking, distribution and the use of cocaine;

2. Wayne and Ardis Traylor had gone to Florida and had brought back "multi-pound quantities" of cocaine;

3. He had seen Wayne Traylor use cocaine in his coffee and had seen him give some of the cocaine to a young woman;

4. Andrews had sold his interest in a tavern and had received $200,000, and had stated that he would be investing it in Traylor's sawmill, but the money was never invested there;

5. The Traylors had not been at their Monroe, Washington home for four weeks;

6. Wayne Traylor had stated that he was going to California for a back operation.

The affidavit further related that:

1. The affiant had run a computer check of Hornback and Andrews which showed that they were suspected by the DEA of being cocaine traffickers.

2. A check by another agent of the DEA of the records of the American Princess Lines showed that the Traylors, along with their granddaughter, had boarded a Princess Cruise ship on February 23, 1980;

3. The cruise ship had made a stop at Cartegena, Colombia, which is known as a major source area of cocaine;

4. A DEA agent talked to crew members of the ship who stated that the Traylors had disembarked for several hours in Cartegena;

5. DEA agents learned that the Traylors were flying from San Juan, Puerto Rico to Los Angeles en route to the Sea-Tac Airport;

6. On their arrival in Los Angeles, a Los Angeles Police Department narcotics dog, Frog, "examined" by smell the luggage of the Traylors. The luggage was identifiable by labels;

7. The dog "alerted" on three of the six pieces of luggage of the Traylors;

8. The dog was certified by the Los Angeles Police Department for the detection of heroin, cocaine and marijuana. The dog had alerted on 705 narcotic training aids which had actually contained drugs, had been responsible for in excess of 50 seizures, and two weeks previous had alerted on all the bags in a seizure of 35 pounds of cocaine.

After reviewing the affidavit, we determine that the informant's report could have been accorded little or no weight. There were no facts in the affidavit to demonstrate that the informant was credible or that his information was reliable. The informant's report was somewhat corroborated by other information in the affidavit; however, we believe that such corroboration did little to give credence to the informant's report.

Nevertheless, we conclude that the search warrant was properly issued as the information provided by the DEA's investigation and the narcotics detection dog's scent examination, even without the informant's report, was sufficient to support a finding of probable cause. The DEA's own investigation showed that the Traylors, along with their granddaughter, had gone on a cruise and had entered and disembarked at a foreign port, Cartegena, Columbia, which was known as a major source area for cocaine. Thus this investigation indicated that there was at least the opportunity for the Traylors to obtain cocaine. Of course, this information alone would not have been sufficient to justify the issuance of the search warrant. However, the affidavit also detailed the scent examination of the Traylor's luggage which was conducted by the narcotics detection dog. With the dog's training record, as well as the dog's past performance record being presented, the magistrate could properly evaluate the reliability of the dog's reactions. We believe this information, along with the DEA's investigation, established probable cause for the issuance of the search warrant. *See United States v. Sullivan,* 625 F.2d 9, 13 (4th Cir. 1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352 (1981).

### 2. *Scope of the Warrant*

While we have determined that the search warrant was properly issued, appellants also question whether the search of their handbags was within the scope of the warrant.[2] We conclude that the search was proper.

The search warrant authorized the search of,

> "the baggage and bags belonging to and in the care, custody and control of Wayne Franklin Traylor, Ardis May Traylor, and Roxie Traylor; as well as on their persons at Seattle-Tacoma International Airport,

which bags are described as a yellow vinyl bag with Delta Tag Number 90–67–41...."

Five other pieces of luggage were described with the same specificity. However, the handbags in question were not specifically mentioned.

Appellants argue that the specific description of the bags should be deemed to have limited the permissible scope of the search warrant to the specifically described bags. While we acknowledge that the wording of the search warrant is not as clear as it could be, we cannot agree with appellant's reading of the warrant.

Search warrants, as well as underlying affidavits, must be read in a "common sense and realistic fashion." *See United States v. Federbush,* 625 F.2d 246, 251 (9th Cir. 1980). The general language of the search warrant —"the baggage and bags belonging to and in the care, custody and control of"—encompassed articles such as the handbags carried by the Traylors. While the specific descriptions might be viewed as narrowing the scope of the search warrant, to so construe the search warrant would be reading it in a "hypertechnical" manner. *See, Id.,* at 251. We believe that the search warrant was appropriately interpreted as authorizing the search of the Traylors' handbags. Therefore, the seizure of the cocaine on March 8, 1980, was valid and the motion to suppress was properly denied.

### B. *Hearsay—Confrontation*

■ Appellants Wayne Traylor and Andrews challenge the admission of the testimony of Cathy McCausland, a witness for the government. They contend that the testimony was hearsay and was not admissible under the coconspirator rule of Rule 801(d)(2)(E) of the Federal Rules of Evi-

---

**2.** Andrews had no legitimate expectation of privacy in the handbags; thus even if the search was illegal, his Fourth Amendment right was not violated. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

dence.[3] Further, Andrews contends that the admission of McCausland's hearsay testimony violated his Sixth Amendment right of confrontation.

McCausland testified that she was a personal friend of Wayne Traylor from at least 1977 through the early part of 1979. She related her use of drugs, her discussions with Traylor about drug use and their discussions about the possibility of smuggling cocaine into the country to make money. She stated that in December of 1978, after Traylor had returned from a trip out of state, she was invited over to his house trailer. In the trailer she was shown seven bags filled with what she described as being cocaine. Among other things, she testified that Traylor described to her how he smuggled the cocaine into the country. McCausland testified that Andrews also showed up at the trailer. She related various statements made by Andrews. She testified that both Traylor and Andrews asked her to get some utensils such as mixing bowls, a sifter, spoons, ziplock bags and a scale. These items, she stated, were used to mix in mannite with the cocaine. She testified that it was Andrews who left the trailer to get the mannite.[4] She stated that after the mannite was mixed in, the cocaine was put into approximately 9 ziplock bags. She testified that Andrews took a larger share of the bags. McCausland also related statements made by Jon Hornback.

Traylor argues that conversations he had with McCausland were merely conversations which did not relate to furthering the alleged conspiracy. Thus he contends the district court erred in admitting the testimony. We disagree.

The statements that are made by a party and which are offered against the individu-

al declarant are not hearsay under Rule 801(d)(2)(A),[5] but rather are non-hearsay admissions. *United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979). Thus Traylor's hearsay objection is without merit.

■ Andrews' contentions are more substantial. McCausland's testimony concerning statements made by persons other than Andrews was not admissible against him unless they were made in furtherance of the alleged conspiracy. We agree with Andrews that certain statements by Traylor and Jon Hornback were inadmissible against him. These included:

1. Traylor's statement to McCausland that he was planning to go on a trip with his wife and granddaughter and he would bring in cocaine at that time.

2. Traylor's general statements about drug use and importation which he made during conversations with McCausland.

3. Traylor's description to McCausland of how he used a back brace to smuggle cocaine past Customs.

4. Traylor's general remark about the difficulty in getting large amounts of money.

5. Jon Hornback's statements regarding the amount of time he spent trying to construct the compartment in the back brace that would carry the cocaine.

The statements were either mere conversations or "casual admissions of culpability to someone [they] had decided to trust." *United States v. Moore*, 522 F.2d 1068, 1077 (9th Cir.), *cert. denied*, 423 U.S. 1049, 96

3. Federal Rules of Evidence Rule 801(d)(2)(E) provides that (d) a statement is not hearsay if (2) the statement is offered against a party and is (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

4. Mannite apparently is a substance which is added to cocaine to dilute its strength and to stretch the quantity of cocaine that is available.

5. Rule 801(d)(2)(A) provides that (d) a statement is not hearsay if (2) the statement is offered against a party and is (A) his own statement, in either his individual or representative capacity.

S.Ct. 775, 46 L.Ed.2d 637 (1976); *United States v. Fielding*, 645 F.2d 719, 726 (9th Cir. 1981). These statements by Traylor and Hornback "concerning the activities of the conspiracy, including future plans, were not in furtherance of the conspiracy since [they] '[were] not seeking to induce [McCausland] to join the conspiracy and [their] statements did not assist the conspirators in achieving their objectives.'" *United States v. Fielding*, 645 F.2d at 726–727, quoting *United States v. Eubanks*, 591 F.2d at 520. Thus the district court erred in admitting the statements against Andrews.

■ However, we determine that under Fed.R.Crim.P. 52(a), this error was harmless. *See United States v. Fielding*, 645 F.2d at 728. McCausland's testimony regarding who and what she saw and what she did not see was not hearsay. *United States v. Eubanks*, 591 F.2d at 518. She testified about Andrews's involvement in the sorting out of the cocaine in December of 1978; about Andrews' role in obtaining the mannite to mix in with the cocaine; and his taking of about 5 bags of cocaine for himself.

Further, she also testified that Andrews, along with Traylor, had requested that she get various utensils that were used in the mixing and sorting of the cocaine; that Andrews stated he could probably sell a pound of cocaine to someone in Alaska for $40,000, and that he stated he wanted to be sure the cocaine was sold so that Ardis Traylor could get her investment back. These statements were not only admissible against him under Rule 801(d)(2)(A) as his own statements; they were also statements in furtherance of the conspiracy and thus admissible as to him and the Traylors. In our opinion, the inadmissible hearsay added very little to the testimony of McCausland that was admissible against Andrews.

Thus we conclude that the error was harmless.

Andrews also contends on appeal that his right of confrontation under the Sixth Amendment was violated by the admission of the hearsay statements. Since Andrews did not preserve this issue by a proper objection at trial, we review the issue under the plain error doctrine.[6]

Although the district court did not analyze the admissibility of the statements made by Traylor and Hornback under the two-step confrontation clause standard of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), we conclude that reversal is not warranted. As we determined in the harmless error discussion above, the inadmissible statements caused little, if any, prejudice to Andrews. Unlike the circumstances in *Fielding*, where "the overwhelming weight of the erroneously admitted testimony was prejudicial," *Id.* at 728, the opposite situation exists here. The statements attributed to Andrews by McCausland and McCausland's description of what she saw, who she saw, and what she did were all admissible testimony which did not create any confrontation questions. Thus any error in admitting the hearsay statements of Traylor and Hornback was harmless beyond a reasonable doubt and there was no plain error.

C. *Identification of the Cocaine by McCausland*

■ In a related matter, Andrews contends that McCausland was incompetent to identify the substance she saw in the trailer as being cocaine.

This contention is not well founded. McCausland could testify as to matters which she had observed and heard. Although McCausland's reference to the sub-

---

**6.** References to the confrontation clause appear in Andrews' trial brief and in his motion in limine. However, after a denial of his motion in limine, a proper objection at trial was not made. Thus the issue cannot be said to have been preserved for appeal. *See Collins v.*

*Wayne Corp.*, 621 F.2d 777, 784 (5th Cir. 1980). Also, although counsel for Andrews raised a *Bruton* objection at trial, such an objection is different from the confrontation clause issue in question here.

stance as cocaine was a conclusion, appellant was not prejudiced by it. McCausland's account of the activities in the trailer and the admissible conversations provided more than enough evidence for the jury to conclude that the substance was cocaine. *See Toliver v. United States*, 224 F.2d 742, 745 (9th Cir. 1955); *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976).

### D. *Gable's Perjured Testimony*

■ Steve Gable was a key witness for the government in this case. In the spring of 1978, he traveled to Bogota, Colombia, to purchase cocaine and he attempted to smuggle it back into the United States by storing it in hollowed out coat hangers. He was caught at the Los Angeles International Airport and was later convicted. Although he did not implicate Andrews at the time of his conviction, he did name Andrews as a participant in the 1978 cocaine smuggling scheme when he was called to testify before the grand jury in this case. It was his testimony which set forth the early 1978 activities of the conspiracies.

Appellants contend that Gable's testimony at trial showed that he had perjured himself before the grand jury and, therefore, the indictment should be dismissed.

■ There is no question that Gable admitted at trial that he made certain false statements before the grand jury. However, the fact that false statements were made to the grand jury does not require the automatic dismissal of an indictment. The due process clause of the Fifth Amendment is violated when a defendant must stand trial on an indictment which the government knows is partially based upon perjured testimony that was *material* in nature. *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974); *United States v. Bracy*, 566 F.2d 649, 654 (9th Cir. 1977),

*cert. denied*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978).

The false statements made by Gable merely related to various details of the cocaine buying trip.[7] The variances between his grand jury and trial testimony did not alter the alleged involvement of the appellants in the conspiracy. Thus the false statements were not material and no due process violation occurred.

### E. *Destruction of Evidence*

Andrews' involvement with Gable in smuggling cocaine into the country was charged as an overt act of the importation conspiracy. The government in this case called upon a chemist of the Los Angeles Sheriff's Department who had conducted the examination to identify the substance that was seized from Gable in 1978. The chemist stated that he had run four tests, a color test, a smell test, a chromatography test, and a gas chromatography test. While admitting that neither one alone would be conclusive, the chemist concluded that as a result of the four tests, the substance consisted of approximately 45 percent cocaine.

Andrews sought to strike the chemist's testimony as the substance tested by the chemist in 1978 had been destroyed shortly after Gable pleaded guilty. Since he was not able to test the substance, Andrews contended the chemist's testimony was not admissible. This motion to strike was denied.

■ When criminal evidence is lost or destroyed, the court's principal concern is whether the defendant can have a fair trial even though he is not able to examine all the relevant evidence. *See United States v. Loud Hawk*, 628 F.2d 1139, 1151 (9th Cir. 1979). A balancing approach is used to make that determination. We consider the

---

7. The false statements made by Gable concerned whether he or Andrews had initiated the cocaine buying trip in early 1978; whether he had received a phone call directing him to a particular hotel in Bogota, Colombia; whether he had received a phone call in Bogota to meet someone in an alley; whether he met someone in an alley with a leather bag; and whether a Dave Krueger (or Krooker) had gone with him to Bogota.

government's conduct in connection with the loss or destruction of the evidence and the prejudice to the defendant, most importantly, whether the evidence that was adduced at trial was sufficient to sustain the conviction. *See United States v. Loud Hawk*, 628 F.2d at 1151–1156.

■ Here, the decision to destroy the evidence was made by the state and not by any federal authority. Although the cocaine was initially seized by the United States Customs, prosecution of the matter was turned over to local officials. Further, after Gable's plea of guilty, there appeared, at that time, to be no reason to retain the cocaine as there is no indication that there was a connection between Gable and anyone else. Thus there was no bad faith involved in the loss of the evidence.

Andrews was prejudiced to the extent that he was not able to conduct independent tests of the substance. However, we believe that the secondary evidence adduced at trial was probative and reliable. The chemist testified that he had run four different tests on the substance before concluding that it was about 45 percent cocaine. Counsel for Andrews conducted an extensive cross-examination of the chemist regarding those tests and also questioned the chemist about possible legal derivatives of cocaine. While having the cocaine available for testing by the defendant would have been the ideal situation, the appellant was not denied a fair trial because of the loss of the cocaine.

8. In our review of the transcript, it appears that on at least one occasion the government allowed an apparently incorrect statement to go uncorrected. In its questioning of Gable, the following exchange took place:

Q. Now you have already testified that you have immunity, is that correct?
A. Yes.
Q. What are the promises, would you say you have from the government?
A. As far as I know, that is it.
Q. Anything about probation?
A. No.
Q. No promises about probation?
A. No.
(Reporter's Transcript 67)

### F. Witness Agreements

■ Andrews alleges that his due process rights were violated by the nondisclosure of agreements made between the government and the two witnesses, McCausland and Gable. We recognize that a new trial is required where the government has failed to disclose evidence affecting the credibility of a witness and when there is a reasonable likelihood that the evidence could have affected the judgment of the jury. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 270, 272, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). However, after reviewing the record, we conclude that the nature of the agreements between the government and the witnesses were adequately revealed to the jury. The full extent of the agreements may not have been brought forth during the government's questioning of the witnesses,[8] but we believe defense counsels' thorough cross-examination did adequately disclose the nature of the agreements. Thus we conclude that no due process right of appellant was violated.

### G. Interview Notes

During McCausland's testimony, it was revealed that interview notes had been taken by the United States Attorney handling the case. Counsel for Andrews requested the production of those notes. The district court denied the request as he determined that the notes were attorney work products.

The government made no further attempt to question Gable about any government promises concerning his probation. However, defense counsel's cross-examination of Gable revealed that the government had been made aware that Gable was in possible violation of the terms of his parole, but had indicated to Gable that they would not bring the matter up with his probation officer and even indicated that they might intervene on his behalf should a problem arise. (Reporter's Transcript 69–70).

In this case, defense counsel was able to set the record straight in his cross-examination. However, we admonish the government that it has a duty to the court and the jurors to correct such inaccuracies when they occur.

**1336**

In *United States v. Goldberg,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976), the Supreme Court held that there was no "work product" exception to the production of material pursuant to the Jencks Act. The question is whether the attorney's notes constituted "statements" under the Jencks Act.

▪ Notes prepared by a government attorney are "statements" and producible where they relate "to the subject matter of the testimony of a government witness [and have] been 'signed or otherwise adopted or approved' by the Government witness." *United States v. Goldberg,* 425 U.S. at 98, 96 S.Ct. at 1342. "This requirement is not met unless the lawyer reads back, or the witness himself reads what the lawyer has written. 425 U.S. at 110–11 n. 19, 96 S.Ct. 1338." *United States v. Goldberg,* 582 F.2d 483, 487 (9th Cir. 1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979).

▪ During a hearing held outside the presence of the jury, McCausland was questioned by counsel for Andrews. In response to his questions, she stated that she had not seen the notes taken by the United States Attorney; that he had never reviewed the notes with her, although the notes had been taken simultaneously with the interview. Under those circumstances, it is clear that the notes did not constitute statements under the Jencks Act and the district court did not err in denying the motion for their production. *United States v. Goldberg,* 582 F.2d at 487.

## H. *Sufficiency of Evidence*

▪ Appellants raise various claims of insufficiency of evidence. In reviewing the sufficiency of evidence to support a conviction, we view "the evidence in the light most favorable to the government in determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Melchor-Lopez,* 627 F.2d 886, 890 (9th Cir. 1980).

First, Andrews contends that the government failed to prove the conspiracies as charged in the indictment. The government charged that the appellants had engaged in a conspiracy to import and a conspiracy to distribute cocaine beginning from about early 1978 and continuing through March 8, 1980. Andrews argues, however, that the government, at best, proved several unrelated conspiracies—a conspiracy between Andrews, Hornback and Gable to import and distribute cocaine in early 1978; a conspiracy between Andrews and Wayne Traylor in December of 1978 to distribute cocaine; and a conspiracy by the Traylors to import cocaine prior to and through March 8, 1980. We disagree.

We believe there was sufficient evidence to show that the conspiracy to import and the conspiracy to distribute had begun from about early 1978 and had continued through March 8, 1980. Gable testified that in early 1978 he was involved with Andrews and Hornback in a scheme to import and distribute cocaine and that their source of cocaine was in Colombia. McCausland's testimony linked the Traylors, from at least December of 1978, with Andrews and Hornback in the conspiracies to import and distribute. McCausland testified that she saw several bags of cocaine in Traylors' house trailer in December of 1978; she saw Andrews there at the trailer; she was asked by both Andrews and Wayne Traylor to get some utensils to use in mixing the cocaine with mannite; and she saw Andrews take about 5 bags of the cocaine for himself. A travel agent testified that the Traylors had stopped over in Colombia on several flights and cruises. These trips took place during the time period of the conspiracies. One of these cruises which the travel agent stated the Traylors took in December of 1978 coincided with McCausland's testimony about the cocaine in Traylors' house trailer in December of 1978. The travel agent also stated that Ardis Traylor had booked a flight to Bogota, Colombia, for herself and Andrews for January of 1980, though Andrews' reservation was later cancelled. The

Traylors subsequently went on a cruise to South America which took them to Cartegena, Colombia, a major source area of cocaine. They were returning from the cruise when approximately 9 pounds of cocaine were found in their handbags at the Seattle-Tacoma Airport on March 8, 1980.

■ The evidence indicates that the initial members of the cocaine importation and distribution scheme were Andrews, Hornback and Gable, with the Traylors joining by December of 1978. However, the fact that the Traylors may not have been a part of the scheme from its inception is not significant. A person may join a conspiracy that has already been formed and is in existence. *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969); *United States v. Castro*, 629 F.2d 456, 465 (7th Cir. 1980). The new conspirator will be bound by all that has gone on before in the conspiracy. *United States v. Bolin*, 423 F.2d 834, 837 (9th Cir.), *cert. denied*, 398 U.S. 954, 90 S.Ct. 1882, 26 L.Ed.2d 297 (1970); *Knight*, 416 F.2d at 1184. Although the membership may have changed during the course of the conspiracies, the essence of the scheme remained the same—to purchase cocaine from sources in Colombia, to import the cocaine into the United States, then to distribute it. There was more than enough evidence upon which the jury could have found beyond a reasonable doubt that there was an ongoing scheme beginning from about early 1978 and continuing through March 8, 1980, in which the appellants conspired to import and conspired to distribute cocaine.

■ Similarly, the Traylors' contentions that they were not a part of the conspiracy are unavailing. "[O]nce the existence of a conspiracy is established, 'evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy.' *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977)

(emphasis in original) (other citations omitted)", *United States v. Melchor-Lopez*, 627 F.2d at 891. The evidence disclosed at trial established beyond a reasonable doubt the Traylors' knowing participation in the conspiracies.

Finally, Andrews argues that there was insufficient evidence to establish that the cocaine found in the handbags of the Traylors had been imported. We cannot agree. In reviewing the evidence in the light most favorable to the government, we believe the jury could have found beyond a reasonable doubt that the cocaine had been imported into the United States by the Traylors.

### III. *CONCLUSION*

The convictions of the appellants are AFFIRMED.